# RICH PRINTING COMPANY, Appellant, v. ESTATE of KENNETH DOUGLAS McKELLAR, Deceased, et al., Appellees.—330 S. W. (2d) 361.

Western Section, at Jackson.  February 25, 1959.

Certiorari Denied by Supreme Court June 5, 1959.

Rehearing Denied by Supreme Court July 27, 1959.

See 330 S. W. (2d) 959.

Hal Gerber, Gerber, Rond & Gerber, Memphis, for appellant.

Sam A. Myar, Jr., Kenneth F. Clark, Jr., McCloy, Myar & Wellford, Memphis, for appellee.

AVERY, P. J., (W. S.). This is an appeal from a decree of the Probate Court of Shelby County, Tennessee, denying the claim of appellant, Rich Printing Company of Nashville, Tennessee, in the amount of $2,542.21 against the estate of the late Senator Kenneth D. Mc-Kellar. The claim is for the balance due on printing and mailing of campaign material ordered by Senator McKellar's Headquarters in Nashville, Tennessee, during the senatorial primary election of 1952.

The total account included not only the printing and the expense incident thereto, but it included the charge for preparing for the United States mail and the postage necessary therefor, of the items ordered by said headquarters in behalf of Senator McKellar's campaign for the Democratic nomination to a seventh term as United States Senator.

Senator McKellar had conducted such a campaign, or had it conducted, as Democratic nominee for the same office in 1916, 1922, 1928, 1934, 1940 and 1946, in each of which former campaigns he was successful in his nomination and thereafter was successful in the regular election which occurred each November following the Democratic primary election, and during each of the former campaigns in the Democratic primary election the appellant had performed similar services as it did perform during the 1952 campaign in behalf of Senator McKellar. His experience in these former campaigns must have been such that he understood the relationship of such candidate to his campaign manager, and also the prevailing custom in Tennessee relating thereto.

The total account was credited with amounts sent from said headquarters to the office of appellant, and when the campaign was over the total account amounted to $21,544.72. The credits thereon, including a contribution to the campaign by Mr. David Morse, manager of appellant, totalled $19,002.51, leaving a balance of $2,542.21, the amount of the claim filed.

During the Democratic campaign in question, Senator McKellar's headquarters was in the Hermitage Hotel, Nashville, Tennessee. It was operated by and through Jimmie Gentry as campaign manager for Senator McKellar, Ward Hudgins as his assistant manager, and Ralph Wheatley in charge of publicity and press relations, under instructions from headquarters manager, which included "news relations, news releases, publicity, printing and the preparation of all kinds of brochures and all kinds of literature". The campaign material involved in this litigation originated with and was prepared by Mr. Wheatley in campaign headquarters and

generally carried by him and turned over to appellant at its office in Nashville, or picked up at the headquarters by Mr. Morse.

Though not expressly shown by the proof, it can be abundantly inferred therefrom that Senator McKellar knew the kind of printing that was being done and being distributed, and on at least two occasions complimented Mr. Wheatley on the contents of the material.

After the campaign had closed, two credits were made on this account, one of $2,000 on August 8, 1952, by cash, and the other of $252.41 on January 14, 1953, by a check signed by Mr. Gentry and delivered by Mr. Ward Hudgins, in addition to the $750 credit on said account by Mr. Morse.

■ We think it a matter of general public political information that a candidate in a State primary campaign, such as Governor and United States Senator, personally selects and appoints a campaign manager and puts him in charge of that which is commonly known as the candidate's headquarters, and this we think is a matter of such public knowledge that the courts may take judicial knowledge that the candidate does select and appoint his campaign manager. Of course he will have the advice and counsel of friends who are supporting him, at least some of the leaders, but the campaign is his and when he has designated and appointed his campaign manager, it is our opinion that the manager of a primary campaign election becomes the agent of that candidate, with a broad scope of authority which includes the selection of an office force for the headquarters and is charged, without specific approval of the candidate when the same has been accepted by the candidate with-

out protest, with the further responsibility of procuring what he considers to be the necessary publication and advertisement of his candidate's campaign.

Senator McKellar died testate on the 25th day of October, 1957. By his will, James Judson McKellar, Jr., C. Irwin Dunn, Sam Nickey, Jr., and W. Stuart McCloy, were nominated as executors. On its probate by order of the Honorable Sylvanus Polk, Judge of the Probate Court of Shelby County, on November 1, 1957, the above referred to executors were duly appointed and qualified. Within the time allowed by law, the questioned claim was properly filed and all necessary notices given thereof.

On March 11, 1958, within the time allowed by law, the appellees, executors hereinabove referred to, filed their exceptions in the following words:

"Said estate is not indebted to claimant, Rich Printing Company, in any amount."

Notice of exceptions was duly given, and the hearing on the exception was set for and heard on May 1, 1958. At that hearing the claimant introduced as its witnesses David S. Morse, manager of appellant, and Mr. Bert Bates, whose oral evidence was preserved in the record. The deposition of Mr. Ralph Wheatley of Nashville, Tennessee, was also offered. The exceptors introduced no proof, taking the position that:

(1) Senator McKellar did not authorize his headquarters to incur the expenses evidenced by the account filed; and

(2) Having not authorized the expense, he did not ratify it after it had been incurred and therefore his estate was not liable on the claim.

After the proof was closed, the record indicates that Judge Polk dictated from the bench his opinion which appears in full in the record, and entered his order sustaining the exceptions and disallowing the claim as follows:

"Order Sustaining Exceptions And Disallowing Claim

"This cause came on to be heard this 1st day of May, 1958, upon the sworn claim of, Rich Printing Company, Nashville, Tennessee; upon the exceptions to such claim duly filed by the Co-Executors; upon the oral testimony of David S. Morse and Mr. Bert Bates, Memphis, Tennessee; upon the deposition of Mr. Ralph Wheatley, Nashville, Tennessee; upon statements of counsel; and upon the entire record in this cause.

"From all of which it appears to the Court that the claimant herein has failed to carry the burden of proof as to the liability of the decedent or his estate for the claim asserted.

"It is, therefore, ordered, adjudged and decreed that the exceptions filed by the Executors to the claim of Rich Printing Company be, and the same hereby are, sustained, and the claim of the said Rich Printing Company is hereby disallowed at claimant's cost, to which action of the Court claimant duly excepted and prayed an appeal to the Court of Appeals, which is granted upon claimant's complying with the law respecting the perfection of such appeals.

"s/s Sylvanus Polk, Judge

"Dated—May 2, 1958

Thereafter, the claimant, appellant in this Court, having saved his exceptions and prayed an appeal to this Court, perfected it and has assigned four errors as follows:

## "I.

"The Court erred in holding that, because the record does not disclose that Senator McKellar did not personally agree to pay the obligation, the claimant failed to carry the burden of proof.

"This was error because this observation is quite beyond the point. Claimant had no such burden. An account is not necessarily proved by admissions of the debtor.

## "II.

"The Court erred in holding that claimant failed to carry the burden of proving that Senator McKellar was liable for this debt.

"This was error because claimant did prove that this obligation was incurred by Senator McKellar, through his agents, either with express or implied authority, or, if not, by ratification of acts of his agents without authority. In either event, the Senator had full knowledge of the transaction.

## "III.

"The Court erred in holding that it is not the general custom for a senatorial, or any political candidate, to personally be bound to pay obligations incurred by his headquarters.

"This is error because the uncontradicted proof is all to the contrary.

"IV.

"The Court erred in denying the claim.

"This was error because the amount of the claim and the manner of performance of the services rendered were not questioned. The claim should have been allowed because it was contracted by Senator McKellar's agents, servants or employees with actual or implied authority or by ratification, as well as by custom and usage."

In the brief of appellee, now before us, under the heading "Recitation of Facts", appears the following statement:

"The late Senator Kenneth D. McKellar entered the 1952 Democratic Primary Campaign for United States Senator from the State of Tennessee in opposition to Mr. Albert Gore (R. 22, 26, 30, 37, 38). A campaign headquarters was organized in Nashville, Tennessee, Mr. James Gentry being Campaign Manager, Mr. Ward Hudgins being Assistant Manager, and Mr. Ralph Wheatley being employed as Publicity Man, for which he received a weekly compensation of $100.00 paid by Mr. Gentry (R. 22, 40). Of these men, Mr. Ward Hudgins directed most of the campaign (R. 22)."

So it will be observed that the campaign headquarters was organized with a manager, an assistant manager, and a publicity director, the publicity director being employed at $100 per week and who appears to be the only one of the three receiving a salary.

It seems proper to set out the statement made by the learned Trial Judge of his analysis of the proof and the

basis for his final judgment, for the proper determination of whether his judgment is correct depends upon whether his analysis constitutes a correct interpretation of the proof, and the governing law. His statement is as follows:

"The Court:

"In this case, a claim has been filed by Rich Printing Company of Nashville against the estate of Senator Kenneth D. McKellar in the amount of $2,542.22, as set forth under oath, to which is attached an itemized statement of the work done in the form of printing matter and the mailing thereof incident to the 1952 primary senatorial campaign, to which the personal representatives of the Estate have filed an exception, denying that the Estate is indebted to the claimant, Rich Printing Company, in any amount whatsoever.

"Two witnesses have testified from the witness stand, Mr. David Morse and Mr. Bert Bates, and one witness testified by deposition, Mr. Ralph Wheatley of Donelson, Tennessee. Mr. David S. Morse signs the affidavit as petitioner to the Rich Printing Company and states that he has been with the company since 1915 and is now manager of the company, and his testimony was not challenged under the so-called Dead Man's Statute [T. C. A. sec. 24-105], and therefore no objection was made to his testifying as an interested party.

"He states he has known Senator McKellar since about 1916 and has furnished services in connection with his business in many campaigns, not only for Senator McKellar but other candidates, too. He also

introduces letters between him and Senator McKellar wherein the account is discussed and certain items statistically dealt with, and the correctness of the itemized account is not challenged item by item.

"Mr. Bert Bates testified that he had long been a close friend of Senator McKellar, that he visited him frequently, that he is now manager of Chip Barwick Chevrolet Company, and that he has discussed this particular account with Senator McKellar. He states that he recommended to the Senator that the bill be paid, but the Court also understood him to say the Senator never did agree to pay the account, or that in effect he, the Senator, was liable for this balance.

"Mr. Ralph Wheatley, whose deposition was taken, states he was hired in the headquarters in Nashville at the rate of $100 per week, that he had nothing to do with the actual making of the contract with Rich Printing Company, but that he did deliver the copy and check the copy and carried payments to the Rich Printing Company.

"Mr. Morse undertook to testify about the custom with reference to the operation of political headquarters. Of course, the senatorial campaign does not take place but once every six years, and the Court permitted his testimony on that point for what it was worth.

"The burden of proof is, of course, on the claimant. This record, if the Court's hearing is correct, does not disclose at any point where Senator McKellar expressly agreed to pay this obligation. That arrangement was apparently made by either Mr. Gentry or some other person in headquarters, be-

tween Mr. Morse and such person. The Court therefore is of the opinion that the claimant has not carried the burden of proof of showing that Senator McKellar personally agreed, or was liable for this obligation. While, as I said before, there is some testimony about the custom, I think it is generally known that a senatorial campaign may involve a tremendous amount of money, and while there is some proof to the contrary, the Court does not think it is the general custom for a senatorial candidate, or any political candidate, to personally be bound to pay any bills that his political headquarters may commit itself to pay. Otherwise, it might be difficult at times to get candidates to run. The Court, therefore finds that the burden of proof has not been carried and disallows the claim.''

The assignments of error pose the following questions:

(1) Were the campaign manager, the assistant manager, or Mr. Wheatley, or any of them, the agent of Senator McKellar with authority, express or implied, to obligate Senator McKellar for the payment of the incurred debt?

(2) If they or either of them had such authority, did Senator McKellar ratify their acts, or the acts of either of them, in their authorization to appellant to perform the services and incur the postage obligation evidenced by the account?

(3) Is Senator McKellar obligated to pay this account because it is the known custom in Tennessee for candidates in primary elections, to pay the legal obligations incurred by their headquarters?

■ There is no necessity to refer to any authority other than T. C. A. sec. 27-303, for the statement that this controversy is before us for a de novo hearing, with the presumption that the judgment of the learned Trial Judge is correct, unless the proof preponderates against it.

The particular questions involved, as relates to a candidate's obligation to pay such expenses as form the basis for the account under consideration, appears to be a case of first impression in Tennessee.

There is some correspondence between Mr. Morse for the Rich Printing Company and Senator McKellar constituting a part of this record, the first of which is a letter dated April 27, 1953 by Mr. Morse to Senator McKellar. This correspondence is extremely significant and particularly the first statement or sentence in this first letter, which letter is as follows:

"Senator K. D. McKellar,
"Mayflower Hotel,
"Washington, D. C.

"Dear Senator McKellar—

*"I got a note from Ward Hudgins saying that you would like to have an itemized statement of the printing that was done during your last Campaign.* I am, therefore, enclosing you this statement with the following explanations:

"Statement for the original printing which was ordered beginning in February 1952 and through May 1952 amounted to $383.69, was paid by check by Mr. Jim Gentry and I am enclosing you this statement marked 'Paid'.

458

"In regard to the mailings which we made, I am enclosing you a complete statement of the mailings. If you like, I will be very glad to send you the receipts from the Post Office showing these mailings.

"Headquarters was insistent that I keep the money separate that they gave me for postage from the money that they gave me to pay on the Printing bill, and from the enclosed statement you can see that there is a balance on the mailing charges of $1659.34.

"I am also sending you an itemized statement of all printing and Sales Tax charges and for wrapping, Parcel Post and drayage. This amounted to $13,-885.38. On this Headquarters gave me $12,000.00, which left a balance of $1885.58. This, together with the balance on the Postage $1659.34, makes a total of $3544.72, from which I have deducted a check sent me on Jan. 14, 1953, $252.51, also contribution which I promised Headquarters, $750.00. This leaves a balance of $2542.21.

"I believe if you will analyze this statement you will find that the amount $2542.21 represents practically all cash. I did not feel that I should be called on to take care of this large amount and on numerous occasions I have talked to Mr. Ormes, Ward Hudgins and Mr. Walters, I have also written Mr. Gentry several letters but have not heard from him.

"I am indeed sorry that this deficit should have occurred, but I feel like the people in charge should have taken care of it.

"With my very kindest regards and best wishes to you, and hoping to hear from you, I am,

"Sincerely,"

(Emphasis supplied.)

From this letter, and specifically that part italicized, it can be properly inferred that Senator McKellar had directed Mr. Hudgins to have Mr. Morse send him an itemized statement of the cost of the printing done in his behalf during that campaign. The question then arises, *—Why did he want such statement?* With that letter it appears Mr. Morse sent the statement, and after Senator McKellar had examined it, on April 30, 1953 he wrote Mr. Morse and the Rich Printing Company the following letter, the last paragraph of which is extremely important in arriving at Senator McKellar's intention, and the entire letter is as follows:

"The Mayflower Hotel
"Washington, D. C.

"April 30, 1953

"Mr. David S. Morse
"Rich Printing Company
"417 Commerce Street
"Nashville, Tennessee

"Dear Mr. Morse:

"Your letter of April 27th with enclosures received and noted, and I have gone over the accounts.

"I notice on Page 1 an item as follows: 'McKellar News and Mailing, $5000.00 on June 27th.'

"And on the same day, 'Record and Mailing, $1900.00.'

"I suppose you have a duplicate of this account, and I want also to call your attention to the page on Statement of Mailing. You have listed an item of 102,311 copies mailed at 1½¢ each—$1534.67.

"Again, 116,110 of the McKellar Record—$1287.53 at 1¢ and 1½¢.

"It would seem from this in the printing matter you included stamps in the $5000 and the $1900 items and then charged the stamps in the stamp account. Perhaps if you would look over the $5000 and $1900 items you may have included stamps there too. Could you tell me what part of the $5000 and what part of the $1900 was for stamps?

"Taking the amount of stamps alone on the McKellar Farm Letter of $7659.34 it would look as if the stamps cost as much as the printing. The total bill for the printing is $13,885.38. In other words, it seems as if the cost of the stamps amounted to half as much or a little more than half as much as the printing.

*"I wish you would look into this again and see. I made specific inquiry when I was in Nashville as to what amounts were owed, if any, and I was told there were none and I was very much surprised when I got your letter saying there was a balance due. Please have your accountant go over this and let me know. I know you did not intend to charge twice for the stamps.*

"With kind regard,

"Sincerely your friend,

"Kenneth McKellar

"CC: Ward Hudgins
    "H. S. Walters
    "Sam Davis Bell"

(Emphasis supplied.)

On May 6, 1953, Mr. Morse, responding to Senator McKellar's letter of the 30th of April, gave a most complete analysis in response to the inquiries made by Senator McKellar. This letter is as follows:

"May 6, 1953

"Senator K. D. McKellar,
"Mayflower Hotel,
"Washington, D. C.

"Dear Senator:

"I have your letter of April 30th and am very pleased indeed to answer the questions you ask in regard to the statement I sent you.

"Regarding the item $5000.00 for McKellar News and mailing on June 27th, this is the date that the job was billed in our office and does not signify that this was when the job was taken. The charge was $5,000.00 and was for the printing of the McKellar News and included counting the papers out in lots of 50, tying them in bundles and placing thereon a slip on the front and back of each bundle showing that they were for Rural Route distribution and to what towns they were to be sent. They were then put in mail bags and each town was put in a separate bag. This is what we call mailing and I might further say that the price of $5,000.00 was the price that we quoted Headquarters before we even began this job.

"You say that on the same day we show a charge. of $1900.00 for 200,000 copies of the McKellar Record. Although this is the day that we billed the job, it does not mean that it was sent out on the same day as the McKellar News. The printing and tying of these 200,000 copies of the Record were at a price of $1900.00, and this price was quoted to Headquarters before we began the printing.

"I sent you an itemized statement of all the Post Office records for stamps. I have the receipts from the Post Office showing that this mail went through the Post Office. The reason there is a differential in the cost of the postage of 1c and 1½c is that on July 1st, 1952, the rate on mailing to Rural Route Box Holders jumped from 1c to 1½c. Let me say to you that there were three separate pieces of literature printed. First there was the McKellar News, then there was the McKellar Record, which was primarily for farmers, and then there was another McKellar Record that was for general distribution and primarily to Service Men. We were carrying on the sending out of all three pieces of this literature at the same time. We started one piece of the literature in one portion of the State, another piece in a different portion of the State, and the third piece in a different part of the State so that eventually voters would get three pieces of literature, but they would not get them all at the same time. I believe that if you will check with Ward Hudgins that he will tell you that we handled this in a successful manner.

"I note what you say in regard to the cost of the stamps amounting to one-half as much as the printing. This happens quite frequently for the reason

that, in a good many cases we print government postal cards in which the cost of the mailing is 2¢ each or $20.00 per thousand, whereas the printing on them is only about one-third of a cent each.

"I trust that my letter to you explains what you have asked and I can assure you that the two items of $5,000.00 and $1900.00 are items which do not have stamps included and that the prices charged were the prices as quoted to your Headquarters.

"I note what you say in regard to asking if there were any accounts left over, if you will notice, the last payment that was given to me was on August 8th, which was after the election and when this payment was sent to me it was sent with the information that the balance of this account would be paid within the next two or three days, as the money was on hand, however, this was never done and the only thing that I can say is, although they did have the money on hand they perhaps used it to pay other bills and felt like that they could take care of mine later.

*"I believe that I sent you copies of letters from Ralph Wheatley, Sam Bell and Ward Hudgins in which they stated that the account was correct, however, if there are any other questions that you would like to ask, I will be very glad to try and answer them.*

"DSM*B                                    Sincerely yours,"

(Emphasis supplied.)

From this last letter, and more particularly the last italicized paragraph thereof, wherein it is asserted that copies of letters from Mr. Wheatley and Mr. Ward Hudg-

ins, as well as one from Mr. Sam Bell, whose connection with the campaign is not otherwise revealed by the proof, were forwarded to Senator McKellar and in which letters these men had stated that the account as compiled was correct. There is also the suggestion that appellant would be glad to furnish the answers to any inquiries which the Senator might make. It does not appear from this record that Senator McKellar ever responded to that letter or that he made any further inquiries about that account.

From these letter communications it is safe to say that:

(1) Soon after the election, Senator McKellar was in Nashville and made inquiry as to what amounts were due, if any, in connection with the expenses of his Headquarters. At that time he was told there were none. (Last paragraph of letter dated April 30, 1953, written by Senator McKellar—Exh. 3, Morse.)

(2) Senator McKellar was later told by Ward Hudgins, his assistant campaign manager, that there was a balance unpaid on the account of Rich Printing Company which had been incurred by order of his managers in his Headquarters. (First paragraph of letter from Mr. Morse to Senator McKellar—Exh. 2, Morse.)

(3) Senator McKellar wanted an itemized statement of this account.

(4) Mr. Morse sent an itemized statement to Senator McKellar, accompanied by a letter giving a minute detailed explanation of the account.

(5) Senator McKellar responded, questioning only the correctness of that part of the account which showed payment of certain postage by appellant; to that letter

Mr. Morse replied immediately explaining that part of the account for postage which Senator McKellar had questioned.

(6) Senator McKellar made no further assertion of incorrectness of the account, nor did he thereafter reply to this last letter of Morse dated April 26, 1953.

(7) The record does not show any further communications, by letter or otherwise, between Mr. Morse and Senator McKellar before the Senator's death on October 27, 1957.

The proof is undisputed that this same firm had printed campaign material and performed similar services for Senator McKellar in his six previous campaigns stretching over a period of 36 years. There is no positive proof, however, of the status of any of the accounts for such work in any of the previous campaigns—that is, whether there was a deficit in such accounts or not. It must be remembered, however, that in each of these prior campaigns Senator McKellar was successful and it can be reasonably assumed that any contributions by friends would be much more willingly made to such expenses of a successful candidate than one who had been defeated. There is nothing in the record, however, to indicate that Senator McKellar's friends had paid all of the expenses of his prior campaigns.

In the absence of any explanation of why no suit was brought against Senator McKellar by the appellant during the four years that he lived after the receipt of the last letter by Mr. Morse, it might be easily inferred that the appellant did not consider the Senator personally liable for the account. In our opinion, such action is fully explained by Mr. Morse. He was questioned about

to whom this credit was extended and was asked whether he had ever brought suit against Mr. Gentry, Mr. Wheatley and also Mr. Herbert Walters, whose name had been mentioned in the evidence, and he said he had not, and added:

"No, sir. I didn't sue Senator McKellar, either."

And he was then asked and answered:

"Q. Are you aware this claim is in the nature of a lawsuit? This claim against the estate is a suit on this account. Are you aware of that? A. Will you allow me to explain something there?

"Q. Yes, sir. A. As I told you, I had long friendship with Senator McKellar. I would have never brought suit against him for this account; and if Senator McKellar had died and not left a large estate, I would have never filed it."

In that same conversation he said that Mr. Ward Hudgins was at that time U. S. Dist. Attorney, and previous to that service had been Senator McKellar's official secretary. He explained further the close connection between Mr. Hudgins and Senator McKellar, without any objection whatever from counsel for appellee, and he was then asked and answered:

"Q. Mr. Morse, in Senator McKellar's campaign of 1952, are you familiar with the organization and operation of his headquarters during that campaign? Will you describe that and tell how it involves with what you have testified to with reference to the general rule. A. Well, I think Mr. Gentry was named campaign manager.

"The Court: Mr. who?

"The Witness: James Gentry, and although he was campaign manager in name, Mr. Ward Hudgins, I think, directed most of the campaign. Also, in that campaign, although he wasn't active at headquarters, was Mr. Herbert Walters, of Morristown, Tennessee. Mr. Ralph Wheatley was publicity man, and the man who wrote all the copies for these various publications. Mr. Wheatley would present me the copy, either bring it to me, or I went by the hotel and got it. Before any of the work was done, he always assured me that the headquarters had discussed it, Mr. Gentry, Mr. Hudgins, Mr. Walters, and that the money for it would be forthcoming.

"The Court: Who is he?

"The Witness: Mr. Wheatley, the publicity man, Your Honor."

In addition to that statement it can further be assumed that Mr. Hudgins was depended upon by Senator McKellar to direct the handling of headquarters because it was he,—Mr. Hudgins, according to the letter of Mr. Morse, by whom Senator McKellar had sent word to have an itemized statement of the account prepared. Furthermore it is observed that when the Senator wrote Mr. Morse for an explanation of the account, he, the Senator, sent a carbon copy of that letter to Mr. Ward Hudgins, Mr. H. S. Walters, and Mr. Sam Davis Bell. It is obvious from this and other proof of very strong corroborative circumstances, that the Senator was expecting Mr. Hudgins to help him in getting any proper correction made, and it is a matter of common knowledge that Mr. Walters was at that time Chairman of the State Democratic Executive Committee, with whom the expense

statement had been or was to be filed. It seems proper to assume that when the Senator requested an itemized statement of that account, it was done for only one of two purposes, as follows:

1st. He wanted it because he felt like he was obligated to pay it and he wanted to be sure it was correct;

2nd. If that was not his purpose, he wanted it so that he could comply with the law relative to filing his expense account.

The law applicable to candidates' expenditures in legalized primary elections and the requirements in regard to filing itemized statements of such expenditures, including that of a United States Senator which is a statewide legalized primary, is found in Sections 2-2101 and 2-2112, inclusive, T. C. A., the pertinent parts of which are:

In Section 2-2101 it is provided:

"Any person who shall be a candidate before * * * primary * * * election for any state * * * office, shall, not more than ten (10) days nor less than five (5) days before such * * * primary * * * file * * * a statement in writing, which shall be subscribed and sworn to before a notary public by such candidate, which shall set forth in detail all sums of money or other thing of value contributed, disbursed, expended or promised by him, and to the best of his knowledge and belief, by any person for or on his behalf, to secure his nomination * * *."

In Section 2-2103, the statement is required to be filed with:

"In case of a state-wide primary, with the chairman of the executive committee of the party; * * *."

In 2-2104, it is provided:

"Not more than thirty (30) days after any * * * primary * * * election, any campaign committee or individual, having charge of the candidacy of any person * * * or managing or paying the expenses * * * of a campaign, for the nomination * * * of any officer * * * shall make out a statement in the same manner and form as that provided for the candidate in secs. 2-2101-2-2103, * * * and filed with the officers as provided in sec. 2-2103."

In Section 2-2105, it is provided that there shall be a fine of $5,000 and not more than 12 months in the County Jail, or both, for violation of this law.

In Section 2-2106, it is provided:

"In case no such statement be filed by any campaign committee or individual having charge of the candidacy of any person, then the candidate shall himself file such statement in addition to that required of him above."

It seems to us, therefore, that a great lawyer who had served in the United States Senate for 36 years, engaged in six primary elections during that period, in requesting a statement of expenditures of his Headquarters, could have had in mind that he felt liable therefor and expected to pay it off, or he wanted it in order to comply with the law. There is no proof in this record whether there had been any compliance with these statutory provisions.

Such being the case, we must assume, therefore, that both Senator McKellar and his Headquarters had com-

plied with the law, which eliminates any consideration to be given to the fact that he wanted the itemized statement for that purpose.

It seems fair to say that when the Legislature passed an Act requiring the candidate to file a statement of his Headquarters expense, in the event his manager in charge did not do so, this established a policy which would require a determination that when a candidate has selected a campaign manager and placed him in charge of his Headquarters, he has made such manager his agent for the conduct of the business of that Headquarters. Whether that assumption is correct or not, standing alone, we are of the opinion that the facts of this case will support the conclusion that Senator McKellar at that time felt himself obligated and expected to pay this account, or any part of it remaining unpaid when an examination of the account had been made as requested by his letter to Mr. Morse to determine if there were duplicate charges, such as postage, which he mentioned.

On the question of whether a custom prevails in this State of such common knowledge that when a candidate for a public office in a legalized party primary selects campaign managers and puts them in charge of his Headquarters, he becomes liable for the legal expense incurred in his behalf,—when such custom is relied upon as in this case, how much proof does it take in the absence of rebuttal proof to establish a prima facie case of such custom?

Looking now to the evidence in the case, the witness David S. Morse, has been with this printing company since he was 11 years of age and was as far back as 1915 in the executive section of the operation of such business,

which has continued without interruption until the present. In describing the business and the custom, he was asked and answered:

"Q. What is the nature of your business, what kind of business do you do, Mr. Morse? A. We handle practically all types of printing, and we handle publications, and over a long period of years we have handled a great deal of political printing.

"Q. Have you been doing political printing since 1915 or 1916? A. Even before that time.

"Q. In that connection, have you come to be acquainted with the operation of political candidates in their efforts to obtain political offices? A. Yes.

"Q. Do they operate through campaign headquarters? A. Yes.

"Q. Do you know of your own knowledge how these headquarters in general are organized and how they are operated? A. Well, what is usually done is that a candidate sets up his headquarters in some hotel, as a rule, and he appoints a campaign manager, and he appoints perhaps a treasurer of the campaign, and he appoints people to do the writing and handling the placing of the ads in newspapers and perhaps make contracts with radio stations and television stations.

"Q. In these political campaigns, in which you have been called to do printing work since 1916, how has your company generally been contacted and employed to do that work?

\* \* \* \* \* \*

"A. What is usually done is that either the publicity man or the manager of the campaign will get in contact with our office and ask us to come by and look at the copy they have prepared and give them an estimate on what it could cost to print certain printed matter. Usually, when that is done, of course, we rely upon the fact that the candidate is behind the situation, although it is being done through his manager or through his publicity man.

\* \* \* \* \* \*

"Q. Mr. Morse, how long did you know Senator McKellar up to the time of his death? A. I met Senator McKellar in his first campaign in 1916.

"Q. Did you do printing work in any of his campaigns before 1952? A. Yes, sir, in every campaign he had.

"Q. In 1952, did your firm handle the account of Senator McKellar in connection with printing done on his behalf in that campaign? A. Yes, sir.

"Q. Did you do that work on a credit basis? A. Well, it was credit to this extent, that as we proceeded with the work, there were payments made. Of course, printing, political printing runs into a great deal of money, especially when we do the mailing and pay the postage, and I think you will notice our statement and that these payments were made, oh, every week or ten days or more.

\* \* \* \* \* \*

"Q. Mr. Morse, what was the character of your printing that was done? A. Well the main thing that

was done was three small news—I would say—tabloids in newspapers. As near as I remember, one of them was Senator McKellar's record of the things he had done that were of vital interest to the people of Tennessee. Another one was a piece of literature on the farm situation, as I remember it, and the third one was the pamphlet on Mr. Gore's record in Congress.

"Q. Were these printings, these publications, done to publicize Senator McKellar, or Senator McKellar's headquarters? A. They were done to publicize Senator McKellar.

"Q. Actually, Senator McKellar and his headquarters were one and the same thing?

"Objection and no answer.

* * * * * *

"Q. What business entity was the McKellar Headquarters? Was it a corporation or partnership, or what was it? A. I couldn't describe it as either a partnership or corporation. A headquarters is usually set up by the individual candidate.

"Q. And was this headquarters, the McKellar Headquarters, set up by the Senator? A. I assume so. That is my experience with all headquarters.

"Q. Do you have any idea how many campaigns, different political campaigns, you have done printing work in? A. We handle a great deal of political printing, and I might say we handle it for both sides. For instance, in the McKellar campaign, we handled Senator McKellar's printing, and we also handled

Mr. Gore's printing. In that same campaign we handled Governor Clement's printing and Governor Browning's printing.

"Q. You have had vast experience in it? A. I think we have had perhaps more experience than some of the other printers have had with political printing, and we have a very complete mailing room, which most printers do not have, and therefore are able to take care of a lot of shipping for them and mailing.

"Q. You said you handled these matters for Senator McKellar in all of his previous campaigns since 1916. Other than the 1952 campaign, did they ever wind up owing you any money? A. No, sir, not as I remember.

Mr. Morse further explaining the difference between a party primary election and a general election, said:

"A. * * * the primary election is a different proposition altogether from your general election. In your election, your campaign is handled by the State Democratic Executive Committee, whereas in the primary, each candidate sets up his own headquarters."

And on re-direct examination, he was asked and answered:

"Q. Whose credit did you look to in Senator McKellar's campaign in 1952? A. In the case of the McKellar Headquarters, I looked to Senator McKellar; and in the case of Mr. Gore's Headquarters, I looked to Mr. Gore.

"Q. In the case of Senator McKellar, who got the benefit of the printing matter? A. I assume Senator McKellar got the benefit. Let me say this, if I may. We have had cases where men were defeated. Of course, when a man is elected, it is very easy for him to pay for campaign printing, whereas if he is defeated, it is a little bit harder to pay. I can recite you numerous cases where men have been defeated, where they afterwards paid off the bills and gave their notes for it in some few cases. Sometimes it took them two or three years to pay it, but they paid it. If you like, I can recite some of the cases."

Mr. Bert Bates, a special friend of Senator McKellar, who had been active in several of his campaigns and who knew of the relationship between Senator McKellar and Mr. Morse of the Rich Printing Company, said he was familiar with the fact that the Rich Printing Company did the printing in the 1952 campaign of Senator McKellar in which he, himself, was very active and that he had a discussion with Senator McKellar about this account. This witness was asked and answered:

"Q. What did he tell you? A. Well, at the time, of course, I visited the Senator practically once or twice a week in the hotel, sometimes more. And, naturally, having been in the campaign as close as I was, and as close as I was to Senator McKellar, I knew practically all about his business and what was going on, but he told me he had received a bill from Dave Morse. We don't refer to him as the Rich Printing Company, because Dave and the Senator have been almost as close as the Senator and myself over a period of years, and Dave Morse has done a

great deal of work for us, so he said he received a bill from Dave and he didn't think he owed it, and he sent it back to Dave; he wanted an itemized statement so he could verify what the bill was for. The bill came down and he went over the bill and said the bill had a great deal of postage and said about half was for postage and the other for printing I advised the Senator he ought to pay the bill. Ward Hudgins advised the Senator he ought to pay the bill. The Senator maintained the headquarters should have paid the bill.

"Q. Did he deny he owed the bill? A. He never denied it to me. He never did agree to pay it. I don't know whether he would have paid it. He was not pressured. Nobody wanted to offend the Senator. Nobody would offend him.

"Q. You have had experience in all kinds of campaigns, have you not? A. I think I have.

"Q. In the State of Tennessee, in addition to Senator McKellar's campaign? A. And campaigns locally.

"Q. Who is looked to as the responsible party in any political campaign where headquarters is established? A. Well, of course, I do think the candidate would be the ultimate man that would be looked to. As an illustration, Watkins Overton, when he ran for Mayor—we paid our bills and settled our accounts, but sixty days later, we got a bill for $265, I think, from the Kelley-Jamison Company. We weren't familiar with it. Of course, Watkins paid that bill. He felt it was an obligation on his part.

"Q. From your experience, is that the custom in cases of this kind? A. I think it would be. If they had the money then certainly it would be.

* * * * * *

"The Witness: I would like to say this inasmuch as I have been injected into this. I am somewhat in the position of an innocent bystander in this matter. I have thought as much of Senator McKellar as my own father. He is as devoted to me as if I was his own son, and I have talked to people. I think I talked to Stuart McCloy and Judson. I have not talked with Sam Nickey. I told both Judson and Stuart I didn't want to see this matter brought into court. I really think the Senator owed the bill, and I thought it should be paid and settled without this, and it is rather embarrassing for me to be here testifying. I tell you that."

In our analysis of the facts and circumstances surrounding the involved transaction, as hereinbefore stated, in an effort to reach a proper and legal conclusion, the rules by which we are governed seem to be properly and specifically set forth in the opinion of the Middle Division of this Court in the case of Rural Educational Ass'n v. Bush, 42 Tenn. App. 34, (certiorari denied February 8, 1957), 298 S. W. (2d) 761, 766, and the citations there enumerated, as follows:

(1) "Agency may be proved by circumstances and by evidence of the conduct of the parties. Hammond v. Herbert Hood Company, 31 Tenn. App. 683, 221 S. W. (2d) 98."

(2) "What agent did with knowledge and approval of his principal is circumstantial evidence of what agent was authorized to do. Boillin-Harrison Company v. Lewis & Company, 182 Tenn. 342, 187 S. W. (2d) 17."

(3) "Burden of proof is on person attempting to establish an agency, that alleged agent was in fact the agent of the alleged principal and was authorized to do the act done. Cobble v. Langford, 190 Tenn. 385, 230 S. W. (2d) 194."

(4) "Whether an agency has been created is to be determined by the relations of the parties as the relations in fact exist under their agreements or acts, whether the parties understand that there is an agency or not. Smith v. Tennessee Coach Company, 183 Tenn. 676, 194 S. W. (2d) 867."

(5) "A principal is bound if an agent acts within his apparent or ostensible authority. McCoy v. Willis, 177 Tenn. 36, 145 S. W. (2d) 1020.

"Our Supreme Court approved this statement of the rule of 'Apparent or Ostensible Authority', Southern Railway Co. v. Pickle, 138 Tenn. 238, 197 S. W. 675, 677:

" 'Apparent authority in an agent is such authority as the principal knowingly permits the agent to assume or which he holds the agent out as possessing; such authority as he appears to have by reason of the actual authority which he has; such authority as a reasonably prudent man, using diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess. Ostensible

authority is such authority as a principal intentionally or by want of ordinary care causes or allows a third person to believe the agent to possess, and in some jurisdictions it is so defined by statute. Ostensible authority to act as agent may be conferred if the principal affirmatively or intentionally, or by lack of ordinary care, causes or allows third persons to act on an apparent agency. It is essential to the application of the above general rule that two important facts be clearly established: (1) That the principal held the agent out to the public as possessing sufficient authority to embrace the particular act in question, or knowingly permitted him to act as having such authority; and (2) that the person dealing with the agent knew of the facts, and, acting in good faith, had reason to believe, and did believe, that the agent possessed the necessary authority.' ''

Applying the foregoing rules to the facts and circumstances of this case, we would be supported by the opinion of the Court of Appeals of Louisiana in the case of Rehm v. Sharp, 1932, 144 So. 78, 79, if we hold that, based on such facts and circumstances as are proven in the instant case, the manager of a candidate in a state-wide, legalized primary election is the agent of such candidate. The circumstances and facts of that case will be best understood by quoting from the opinion:

"The record shows that Mr. Clark and Mr. Sharp were friends, and had had business transactions for several years prior to the time that Mr. Clark ran for Governor. It appears that Mr. Sharp convinced Mr. Clark that, if he would qualify as a candidate for Governor, he would have a splendid chance of win-

ning. While the matter was under discussion be-
tween them, Mr. Sharp prevailed upon the plaintiff
to use his automobile to drive Sharp to Iota, La.,
and return on September 5, 1931, a distance of 418
miles, and on September 29, 1931, to Hammond and
return, a distance of 185 miles. On October 8, 1931,
Mr. Clark formally announced his candidacy and
named Mr. Sharp as his campaign manager. There-
after, on October 15, 1931, the plaintiff in his auto-
mobile drove Mr. Sharp from New Orleans to Holden
and Baton Rouge, La., and return, a distance of 350
miles, and on October 26, 1931, from Holden to
Baton Rouge, a distance of 270 miles. It was also
shown that the plaintiff worked for nine days in
behalf of Mr. Clark upon the authorization of Mr.
Sharp.''

Plaintiff Rehm brought suit against both Clark and
Sharp in an action of debt for salary and automobile
expense incurred in connection with Clark's campaign.
A jurisdictional question was invoked as to Sharp and
the suit was dismissed as to him without prejudice. De-
fendant Clark relied upon three grounds of defense:

''First, that, at the time of the first two automo-
bile trips, on September 25 and 29, 1931, respectively,
Mr. Sharp had not been employed as his campaign
manager and was not so employed until October 8,
1931; secondly, that plaintiff undertook to work for
the defendant Clark in anticipation of securing polit-
ical employment should Mr. Clark's candidacy have
been successful; thirdly, that plaintiff's remunera-
tion was conditioned upon Mr. Sharp successfully
raising a campaign fund, which he failed to do.''

There was a judgment on the merits dismissing the suit and the plaintiff appealed. Plaintiff proved by his own statement and that of his mother that he was employed by Sharp who was the campaign manager for Clark. The Court of Appeals of Louisiana held that that part of the claim for services rendered prior to the appointment of Mr. Sharp as campaign manager for Mr. Clark, could not be allowed because prior to that date Sharp had no authority as agent of Clark. The Court then said:

"But since Mr. Sharp, as campaign manager, had the actual or implied authority to employ the plaintiff to render services in behalf of Clark's candidacy after October 8, 1931, and to incur reasonable expenses for automobile services in traveling, the defendant Clark would be liable for any indebtedness arising subsequent to October 8, 1931, unless it can be said, under the second or third defenses, that the defendant Clark is not liable."

On the defense of service based upon a consideration of anticipated employment in the event Clark was successful, the Court said:

"We are not impressed with the statement of Mr. Sharp that the plaintiff rendered his services solely for the purpose of securing future employment of a political nature in the event Mr. Clark was elected Governor of the state. His testimony is not corroborated by Mr. Clark on this point, who was uninformed on the subject. This is a special defense, and defendant bore the burden of proving it by a preponderance of the evidence, and, as the plaintiff and his mother both testified to the contrary, we believe that the second defense must fail."

On the question of payment in event campaign funds were contributed for the candidacy of Mr. Clark, the Court said:

"With reference to the third defense, Mr. Clark testified that he did not know of the plaintiff's claim until some time in the early part of January, 1932. Mr. Sharp testified that he had agreed with the plaintiff that he would be paid $5 a day for actual services rendered and for the use of his automobile in the event a campaign fund was collected, and that, as he failed in his efforts to secure campaign funds, there was not any money available to pay the plaintiff's claim. The plaintiff and his mother again contradicted Mr. Sharp's statement, although they admit that he did tell them he was making efforts to secure funds for campaign expenses from those who were interested in or advocated the candidacy of Mr. Clark. We are not impressed with this defense, and in fact it seems to be inconsistent with the second defense that the plaintiff's reward was to consist of some political appointment in the event Mr. Clark was elected Governor.

"We therefore conclude that the plaintiff is entitled to recover for his services rendered on October 15th, 16th, 17th and 18th, and October 26th, 27th, and 28th, at the rate of $5 a day, or a salary of $35. He is also entitled to recover for the automobile trips on October 15th and 26th, from New Orleans to Holden and Baton Rouge, La., and return, which totaled 620 miles, which, at the rate of 6 cents per mile, aggregates $37.20, thus making the total of both items $72.20."

Pending the appeal, Clark had died, a testamentary executor was duly qualified, and by proper proceedings was made a party to the suit. The Court of Appeals set aside the judgment of the Lower Court and rendered judgment in favor of the plaintiff, for the full amount of services sought to be compensated for, rendered by plaintiff Rehm after Sharp was appointed as Clark's campaign manager.

Defendant has relied upon a theory that the campaign headquarters of Senator McKellar in charge of Mr. Gentry, as campaign manager, Mr. Hudgins as his assistant who did most of the work, and Mr. Wheatley, as publicity director, was no more than a voluntary association without any by-laws, regular meetings or authority to bind Senator McKellar. In counsel's brief, they have said:

"So, in this record, there is nothing to indicate that the Nashville headquarters with which claimant dealt was anything more than a loosely formed, voluntary association, without by-laws or regular meetings and which had given to no one authority to act."

They rely principally upon the case of Bloom v. Vauclain, 1938, 329 Pa. 460, 198 A. 78. We have read all of the authorities cited by defendant's counsel and we do not believe any of them present a parallel or a criterion by which the instant litigation on the record before us, must be decided. We agree with them that the cases upon which they rely were correctly decided based upon the facts of those cases, but we cannot agree that candidates for nomination within a political party in an election which must decide the nominee for that political party to be elected by a subsequent general election can be put in the same class with "associations and clubs organized

for objects which are social or political''. We must also bear in mind that no proof whatever was offered by the defendant in the instant case, but it must not be overlooked that the publicity director was procured, contracted with, as he said by the campaign manager, to prepare the necessary documents and publications for the candidate at a fixed salary per week. He positively testified that the campaign manager contracted with the plaintiff, Rich Printing Company, for the printing, preparation to mail and the necessary postage. It is proven without contradiction that on two occasions Senator McKellar complimented him on the material which he had prepared and which Rich Printing Company had printed and mailed to the public. It would be an insult to the intelligence of Senator McKellar to say that he did not know the kind of material that was being put out in behalf of his candidacy.

Mr. Morse testified without contradiction that it is a custom in these party primaries for the candidate, with an organization such as Senator McKellar had in his headquarters, to be responsible for the legitimate expenses incurred in connection therewith.

Aside from the question of agency, which the learned Trial Judge discussed in his delivered opinion, it seems that he reached his conclusion upon what he thought was a general custom rather than upon the proof of such a custom as exists in this record. In that regard, he said:

"* * * the Court does not think it is the general custom for a senatorial candidate, or any political candidate, to personally be bound to pay any bills that his political headquarters may commit itself to pay. Otherwise, it might be difficult at times to get

candidates to run. The Court, therefore finds that the burden of proof has not been carried and disallows this claim.''

Might it not be said that in event a candidate in a legalized primary election is not to be responsible for the expense of printing and postage necessary for a proper campaign, such as are the basis of the claim under consideration, ''it might be difficult'' to procure the proper publication of the candidate's qualifications, his platform and past record, so that the people could express an intelligent choice who were not personally acquainted with him, with his characteristics, his capacities and the record of such candidate, and arouse the interest of his supporters to greater effort in his behalf.

In the case of Bloom v. Vauclain, supra, the Court in outlining the facts said:

''Here appellee served as treasurer at the request of a friend of one of the candidates, and held the position by mutual consent rather than election. His duties were merely those of a custodian of campaign contributions, disbursing them upon vouchers signed by the chairman and publicity director. He had no authority to order printing to be done, and could not be held liable for the orders of the publicity director, any more than a candidate could be held liable where he had no part in authorizing the work done. The finding of the court below that appellee took no active part in the campaign and had no control over its conduct, is well substantiated by the record.''

It does not appear whether this was a primary or general election campaign, but it does appear that there was a voluntary organized political committee which was

sponsoring the election of a particular set of candidates, but there is no showing whatsoever that either of the candidates appointed a campaign manager or a publicity director. There was no connection whatever between the litigants in that case, that is, the plaintiff suing for payment of printed matter and any particular candidate. This treasurer of a contribution fund was clearly not selected by any candidate or candidates so far as the proof is concerned, and he only made payments upon the vouchers signed by the publicity chairman of that committee and the publicity director. Nowhere does it, either expressly or by necessary implication, appear that this treasurer had any authority to contract for any expense of printed matter or other service, and the Court said in the very beginning of its opinion that:

"Appellee Vauclain did not personally authorize this work to be done, and the burden was therefore on appellant to show that the purchases were made by the agents of appellee, with his authority. It appeared that appellee was treasurer of the so-called campaign committee and appellant endeavored to show he assented to the purchases."

Of course the Court in that case was correct in determining that that organization was the same as an association or a club and would be governed by the same rules. As we read that case, it is similar to the illustration that Mr. Morse gave in his testimony to the effect that in a general election the party organization assumed the responsibility of the expenses of the campaign in behalf of its nominee.

It is axiomatic that an agency may be created for any lawful act and that whatever a person may law-

fully do, if acting in his own right and in his own behalf, he may delegate that authority to an agent. It is also axiomatic that authority cannot be lawfully delegated which is illegal, immoral or opposed to public policy, nor can one delegate an act which is personal in its nature, such as designating an agency to perform a personal duty or a personal trust. Of course an elected officer cannot delegate one to hold the office to which he has been elected in the absence of statutory authority so to do, nor to cast his vote for him.

■ We feel constrained to reverse the judgment of the Lower Court for the following reasons:

1st. The proof is uncontradicted that Senator McKellar appointed a campaign manager and acquiesced in organizing the headquarters;

2nd. That manager had a right to incur on behalf of his principal the necessary expenses in conducting that campaign;

3rd. The printing matter and the postage supplied by this printing company was contracted for by the campaign manager, according to this record;

4th. Such was in the scope of his authority so to do.

■ Therefore, we are of the opinion that Senator McKellar was bound by the act of his agent in so doing. If it could have been determined by a proper presentation of the facts that the campaign headquarters was a voluntary organization, which this record nowhere discloses, we think this record supports the conclusion based upon the circumstances, including the letters passing between this printing company and Senator McKellar, after the

election was over, of a preponderance of proof in favor of his ratification of the account.

We are further of the opinion that regardless of what might have been proven, that from what was proven in the testimony of Mr. Morse in support of the claim of the Rich Printing Company, preponderates in favor of the custom in Tennessee to the effect that a candidate in a primary election is liable for the legal expenses incurred by his campaign manager, where such manager is selected by the candidate. Of course he would not be liable if he merely accepted the services of a manager in his campaign, put there by others, unless he thereafter expressly or by implication ratified such expenditures.

We are also of the opinion, as hereinbefore stated, that the law of the State of Tennessee relative to the requirements of candidates and their campaign managers to file expense accounts as hereinbefore set forth, supports the public policy of making a candidate in a primary election liable for the expenses legally incurred by his headquarters.

It is our opinion that this record—and certainly we have no other record shown by the defendant of any acts of candidates or of which we could judicially know—would justify no other conclusions than those herein set out.

Therefore, the judgment of the Lower Court is reversed and judgment will be rendered in this Court overruling the exceptions filed to the claim, and sustaining the claim as filed in the amount of $2,542.21 as a proper claim against the estate of K. D. McKellar, deceased, and to be allowed as such and paid in the final accounting of his executors, together with the costs of this proceeding,

but no interest will be allowed thereon in view of the fact that this is a case of first impression in Tennessee.

This case will be remanded to the Probate Court of Shelby County where the administration of the estate of K. D. McKellar may be there concluded in accord with this opinion and the judgment of this Court insofar as the claim here litigated is concerned.

Bejach, J., concurs.

Carney, J., dissents. (330 S. W. (2d) 959.)

CARNEY, J., (dissenting). I respectfully disagree with the majority opinion and would affirm the judgment of the Probate Court disallowing the claim.

It is true that Mr. Morse testified that his company always looked to the candidate for payment in primary elections and no proof was introduced to the contrary. However, I am of opinion that this evidence is not sufficient to prove or establish the existence of the usage or custom insisted upon.

Not only did Mr. Morse not give any instances in which other companies had charged printing expenses authorized by a campaign manager to the candidate himself but he gave no other instances in which his company had charged such printing to the candidate himself. He merely stated that he could give some instances where defeated candidates had paid the deficit if requested so to do. See Standard Oil Co. v. Swan, 1890, 89 Tenn. 434, 436, 15 S. W. 1068, 10 L. R. A. 366.

As a general rule in order to establish a usage or custom the evidence thereof must be clear and satisfactory. When the custom is a particular one it is especially im-

portant that the proof be clear and conclusive. In order to establish a usage or custom it is not sufficient to prove isolated instances. 55 Am. Jur., Usages & Customs, page 316, Section 56—Weight & Sufficiency of Evidence. See also Greenleaf on Evidence, 15th Edit. Vol. II, Section 252.

Also it is almost universally required in order to hold a person bound by an alleged custom or usage, that he have either actual or implied knowledge of such custom; if it does not appear that he had actual knowledge of it, the custom or usage should be one so general that he will be presumed to have knowledge of it. More particular the rule is stated to be that before a person can be chargeable with a custom or usage, the practice in question must be so notorious as to affect him with knowledge of it and raise the presumption that he dealt with reference to it, or he must be shown to have had actual knowledge of it. 55 Am. Jur., Usages & Customs, page 282, Section 21—Knowledge of Usage or Custom.

Senator McKellar represented the State of Tennessee in the United States Senate for approximately forty years. During that time he made several state-wide campaigns. In some of these races Mr. Morse was an active supporter of and worker for Senator McKellar.

In none of the former campaigns was Senator McKellar ever asked by Mr. Morse to pay any printing bills arising out of said campaigns. Mr. Morse explained this fact by saying that in those campaigns Mr. McKellar won and that it is no trouble for a winning candidate to have campaign expenses paid. Hence, there was no deficit until after Senator McKellar was defeated in 1952.

Mr. Morse himself testified that Senator McKellar was very careful to keep campaign funds separate from his personal funds; he would not even endorse a campaign contribution check but meticulously insisted that some person active in the campaign do so. This habit on the part of Senator McKellar suggests to us that he also considered liability for campaign expenses separate and apart from his personal liability.

Hence, I am of opinion that the estate is not liable on the theory of custom and usage both because the evidence is insufficient to establish the custom and because there is no proof that Senator McKellar had knowledge, actual or implied, of the alleged custom.

Now with reference to the liability of the estate for the debt under the general principle of law of agency, I agree that the case of Rehm v. Sharp, 1932, La. App., 144 So. 78, supports the majority opinion and is contrary to this dissent.

With great deference to the Supreme Court of Louisiana and even greater deference to the opinion of my learned colleagues, I question the soundness of such a rule. It is now a matter of general knowledge that a state-wide race for public office, either in a primary or general election, requires the expenditure of many, many thousands of dollars through many different hands and for many different purposes.

Campaign literature and buttons; television appearances; radio time; newspaper advertising; job printing and mailing as in the present case, all on the state level probably make up the greater portion of the total campaign expenditures.

In addition we know that state campaign managers appoint local or area campaign chairmen who in turn expend or authorize the expenditure of considerable sums of money for campaign purposes. Oftentimes these expenditures by the local chairmen are done upon the express authority of the state campaign chairman. For instance the state campaign headquarters often furnishes to local headquarters prepared material to be used on local radio, local television and in local newspapers. Street banners and road signs are sometime furnished from state headquarters to local or area chairmen to be installed or erected at local expense.

I think it is a matter of general knowledge that the money for these many expenditures both on the state level and on the local level is raised usually by interested workers and only a small percentage of the cost of a state-wide race is paid by the candidate himself.

Obviously, the candidate himself cannot supervise all of these many activities and many others not mentioned above, though he knows and intends that they will be done for him in behalf of his candidacy. In my humble opinion it would not be in the public interest to saddle upon every candidate for state-wide office a potential liability of so many thousands of dollars and the possibility of multiple claims against him with such limited opportunity to protect and indemnify himself against such liability.

Finally, it is my opinion that the testimony affirmatively shows that at the time Mr. Morse contracted for this printing he was not looking to or expecting Senator McKellar to pay any of the cost of the printing. It was to be a cash transaction and he was looking to the cam-

paign manager, Mr. Gentry, to pay him along each week as the work progressed. Further, I think the testimony of Mr. Morse indicates that he fully understood that this cash was to come only from campaign contributions and that he was not expecting Senator McKellar to underwrite and guarantee the many contracts entered into by Mr. Gentry including this one with Rich Printing Company.

Hence, I think His Honor the Probate Judge properly disallowed the claim.