IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
October 3, 2000 Session

# WILLIAM DAVIDSON v. RICHARD HOLTZMAN, ET AL.

**Appeal from the Chancery Court for Hamilton County**
**No. 98-1041     W. Frank Brown, III, Chancellor**

**FILED NOVEMBER 2, 2000**

**No. E2000-01091-COA-R3-CV**

---

The jury awarded the plaintiff, William Davidson, damages for breach of two oral contracts between Davidson and his former employer, the defendant Richard Holtzman, who, at the time the contracts were made, was the sole shareholder of the defendant Engel Stadium Corporation ("the Corporation").[1]  Defendants[2] appeal, arguing (1) that one of the agreements is barred by the Statute of Frauds; (2) that the same agreement is too indefinite to be enforced; and (3) that the trial court erred in admitting the testimony of another former employee of Holtzman.  We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court**
**Affirmed; Case Remanded**

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which HERSCHEL P. FRANKS and D. MICHAEL SWINEY, JJ., joined.

Michael E. Richardson, Chattanooga, Tennessee, for the appellants, Richard Holtzman and Engel Stadium Corporation.

William H. Horton, Chattanooga, Tennessee, for the appellee, William Davidson.

**OPINION**

---

[1]After the contract was made, Holtzman sold his shares of stock in the Corporation.  At trial, the parties stipulated that Holtzman and the Corporation would be jointly and severally liable for any judgment rendered in the plaintiff's favor.  It was further stipulated that, pursuant to an indemnification agreement executed at the time of sale, Holtzman was obligated to indemnify the Corporation for any resulting judgment.

[2]Both Holtzman and the Corporation were represented by the same attorney at trial.  Both defendants filed a notice of appeal; however, the appellate brief lists only Holtzman as an appellant.

## I. *Facts*

In 1984, Davidson was hired as general manager of the Midland Angels baseball team, a minor league baseball franchise in Midland, Texas. Holtzman acquired the franchise in July, 1987. In 1988, Davidson and Holtzman discussed Davidson's future with the franchise. Davidson expressed his goal of eventually owning and operating his own baseball team. He indicated that to accomplish this goal, he needed to begin acquiring equity in the Midland franchise in order to "build up some value." In a letter to Holtzman dated September 23, 1988, Davidson indicated that for 1989, he wanted "to receive an ownership percentage of whichever club I may be affiliated with." In December, 1988, Davidson and Holtzman had a conversation regarding Davidson's future employment with the franchise. Davidson testified as follows:

> A. During that conversation [Holtzman] said things to me like, you know, you're a valuable employee, I feel fortunate to have someone of your caliber working for me. He indicated to me that I could accomplish my objectives if I worked with him and that was his goal, was to help me accomplish those objectives of being an owner/operator of a minor league baseball team, and in that conversation he offered me 5 percent of the Midland baseball franchise at the price that he paid for it. He said it would be booked at that value and that if he sold it at some time while I was still employed with the team that I would receive 5 percent of the profits from that sale.
>
> He indicated to me that there were tax advantages for me if it was done in that fashion, and that's basically the summary of the conversation.
>
> Q And what did you understand him to mean when he said that if it was done in that fashion?
>
> *     *     *
>
> A I understood that it would, mean that basically was the agreement, that it was better for me if -- it was better for me if he simply told me that I had this stock, or phantom stock or agreement with him, that it was better for me financially if I took him at his word and that he would pay me down the line if indeed he happened to sell the team while I was employed with that team.
>
> Q And did he issue you any stock at that time in the Midland --

A        No. He did not issue me any stock, and from the conversation I didn't expect to receive any, because, you know, I took him at his word that there would be tax advantages for me to do it in the fashion that he outlined.

Q        Did he make any offer as to any percentage of income on a yearly basis?

A        Yes. He also indicated that going forward I would receive 5 percent of the net profits, net operating profits of the franchise. Previous to that I was under a different compensation arrangement and he changed it to that.

Q        Did you indicate that you'd be willing to stay under those circumstances?

A        Yes, I did.

In August, 1989, Holtzman offered Davidson the position of general manager of the Chattanooga Lookouts, a franchise Holtzman had recently acquired for $1.1 million. The Lookouts franchise was operated by Engel Stadium Corporation, of which Holtzman was the sole shareholder. Holtzman promised Davidson that the parties' understanding regarding his share of the net proceeds from a sale of the franchise would "transfer" with Davidson to Chattanooga, meaning that if Holtzman ever sold the Chattanooga franchise, Davidson would receive five percent of the difference between the purchase price and the sales price of the franchise. Davidson agreed and moved to Chattanooga in October, 1989. He was employed as the Lookouts' general manager for the next six years, receiving a salary plus five percent of any annual net operating profit of the franchise.

In 1992, the Corporation sued the City of Chattanooga and Hamilton County, which leased the stadium facilities to the Corporation, alleging that the City and County had negligently failed to maintain the baseball field in violation of the lease. Holtzman asked Davidson to assist the Corporation's attorney in the litigation. When Davidson complained that the time spent on the litigation would interfere with his management of the team, Holtzman promised that Davidson would receive five percent of any proceeds resulting from the lawsuit. Holtzman told Davidson that he considered any proceeds received to be "operating income" of the Corporation. Davidson agreed to this arrangement, and participated extensively in the litigation. The lawsuit proceeded to a jury trial, in which the Corporation was awarded damages. On appeal, however, this Court vacated the judgment and remanded for further proceedings.[3]

---

[3]See *Engel Stadium Corp. v. City of Chattanooga,* C/A No. 03A01-9208-CH-00279, 1993 WL 188234 (Tenn. Ct. App. E.S., filed June 2, 1993).

In January, 1995, Holtzman advised Davidson that he had agreed to sell the franchise[4] for $3.75 million. Holtzman stated that Davidson "would benefit substantially from the sale." As part of the sale, the lawsuit against the City and County was assigned to Holtzman, and he was substituted as a party in that action. The sale was completed in April, 1995. Davidson continued to work for the Corporation in his capacity as general manager. In May, 1995, he met with Holtzman while at a baseball game in Davenport, Iowa, where Holtzman gave him a check for $25,000 and "indicated that there would be substantially more from where that came from."

Although Holtzman had been substituted as a party in the litigation against the City and County, Davidson continued to assist with the litigation. The parties eventually reached a settlement agreement in November, 1995, and Holtzman received $375,000 as a result of that litigation.

By January, 1996, Davidson had not received any additional proceeds, either from the sale of the franchise or the lawsuit. He sent a letter to Holtzman dated January 3, 1996, seeking "to finalize the arrangements regarding monies due from operations in Chattanooga. Specifically, the sale of the franchise and the settlement with the City and County." On January 8, 1996, Davidson received a fax from Holtzman, stating, in pertinent part, as follows:

> I've discussed the issue of the "benefits". I'd like to pass on to you
> with my accountants over the past months and hope to have some
> concepts for your [sic] shortly. I too, have some financial issues I'm
> focused on that coincide with Chattanooga.

On April 8, 1996, Davidson sent another letter to Holtzman, regarding the parties' agreement and asked for the balance[5] of the monies owed him. Davidson received no response to this letter. He continued to send correspondence to Holtzman over the next four months, seeking to finalize the parties' agreement. Finally, in a fax dated August 29, 1996, Holtzman responded, stating, in pertinent part, as follows:

> I have not ignored the main issue of your letter, Bill. I have given a
> great deal of thought to it and still need to consult with some folks.
> I've always tried to "do the right thing" regarding financial issues.
> Please be patient.

Davidson sent Holtzman a letter in September, 1996, acknowledging Holtzman's August letter and thanking him for his "willingness to resolve the Midland and Chattanooga issues." Several months passed, however, without word from Holtzman. Davidson sent a memorandum to him dated February 15, 1997, asking for any word on settling the parties' "monetary issues." Five days later,

---

[4]The transaction was actually a stock purchase agreement of Holtzman's shares of stock in the Corporation.

[5]It was Davidson's position at trial that the $25,000 payment he received in May, 1995, from Holtzman was part of the proceeds from the sale of the franchise.

-4-

Davidson received a handwritten facsimile from Holtzman, indicating that the parties needed to talk and asking Davidson to call him. Davidson called and left messages for Holtzman numerous times, but received no response. Davidson sent more correspondence, by mail and facsimile, over the next several months in an attempt to contact Holtzman, all without success.

## II. *Trial*

Davidson filed this suit in October, 1998. Before trial, the defendants filed motions *in limine*, seeking to exclude or limit the testimony of Michael Feder, whom Davidson planned to call as a witness. Feder was employed by Holtzman as general manager of the Tucson, Arizona Toros, another minor league baseball franchise owned by Holtzman. Feder had also filed a lawsuit against Holtzman, claiming that Holtzman had promised to pay him five percent of the net profit derived from the sale of the Tucson Toros. Defendants expected Feder to testify that Davidson had told him that Davidson "felt he was owed money by...Holtzman." They argued that such testimony would be inadmissible hearsay. Defendants also expected Feder to testify that Holtzman had made an offer to him that was similar to the one allegedly made to Davidson. Defendants argued that such testimony would be irrelevant, hearsay, and otherwise inadmissible under the rules of evidence.

The case proceeded to trial, with no pre-trial rulings on the motions *in limine*. Plaintiff's proof consisted primarily of the testimony of Davidson and Feder and the correspondence Davidson claimed to have sent to and received from Holtzman. Davidson was the first witness to testify. On direct examination, he was asked, without objection, as follows:

> Q       Okay. Did you discuss your compensation arrangement with Mr. -- a guy named Michael Feder?
>
> A       Yes.
>
> Q       Who is Michael Feder?
>
> A       He is general manager of the Tucson Toros baseball club. I think he's got a new title now, but he has functioned as general manager of that team for almost ten years now.
>
> *       *       *
>
> Q       Is Tucson a franchise owned by Mr. Holtzman or was owned by Mr. Holtzman?
>
> A       It was owned by Mr. Holtzman. I'm not exactly sure when he purchased it. I believe it was in 1988, and he sold it just a couple years ago, in 1997, I believe.

On cross examination, Davidson was asked as follows:

> Q    And I take it when -- according to your testimony, Holtzman's going to fulfill this interest and offer you some equity, I assume you were pretty excited about it?
>
> A    Yes. That's a reasonable assumption.
>
> Q    But you never went home and told your wife about it, did you?
>
> A    No, that's not true. What I testified earlier [in deposition] is that I didn't recall if I did or didn't tell her. I couldn't recall specifically about that. I assume that I -- I would assume that I would, but I can't recall a specific conversation with her about that.
>
> *       *       *
>
> Q    Let me refer once back to your deposition, and again, you told the truth in your deposition, I assume?
>
> A    Yes, sir.
>
> Q    Page 26, line 11, Question: Okay. Other than Mike Feder, did you ever tell anyone else about Holtzman, about your agreement with Holtzman regarding the percentage of the net profit? Your answer?
>
> A    My answer was, no.
>
> Q    Next question: Okay. Did you ever tell your wife, your ex-wife?[6]
>
> A    My answer was no. There's additional.
>
> Q    Well, the next question ends, and why didn't you tell her? And that's when you say?
>
> A    I don't recall why I didn't tell her. But if you go on just a couple of pages, another page over, my answer was, I was thinking in terms of business associates when you raised the question. I'm

_____

[6]Davidson and his wife divorced in 1996.

sorry, I was confused at that time. You were asking me, as you were today, about the CPA and what people I shared that information with, and I was thinking from a business standpoint and not a personal standpoint.

Q        Well, let me go back because maybe I didn't read this well. The question was: Other than Feder did you ever tell anyone? The answer was no.

The next question, what was my question?

A        Did you ever tell your wife, your ex-wife?

Q        And what was your first answer?

A        My first answer was no.

After Davidson testified, the trial court advised the jury that due to scheduling problems, Davidson's second witness, Feder, would testify after the defendants had presented their proof.

Defendants presented only one witness, Holtzman. He denied the existence of any oral agreements with Davidson. As for the $25,000 payment, he stated that it was merely a bonus. He testified that the "financial issues" referenced in his correspondence were related to compensation for some consulting work Davidson had performed for Holtzman. Additionally, Holtzman introduced three memoranda, which he claimed he had sent to Davidson regarding Davidson's claims. In the first memorandum dated April 29, 1996, Holtzman denies the existence of an oral agreement. In the second memorandum dated March 12, 1997, Holtzman states that the parties "simply differ on [Davidson's] compensation" and that Holtzman "[did] not have an understanding with any other G.M. [general manager] either." In the third memorandum, dated August 20, 1997, Holtzman calls Davidson's claims "absurd fantasies" and refers to the $25,000 payment as a gift. These memoranda were not produced during discovery, and Davidson denied receiving any of them.

On cross-examination, Holtzman was asked, without objection, as follows:

Q        And did you have any arrangements with any other manager in baseball to pay them a percentage of the difference in the purchase price of a franchise and the sale price of a franchise?

A        No, never.

At the beginning of the second day of trial, the trial court addressed for the first time defendant's motions *in limine*. The trial court held that it would permit Feder to testify as to Davidson's statements to him regarding Davidson's arrangement with Holtzman, reasoning that "the

door has been opened to some extent by [defendants' counsel] asking questions and making statements to the jury in opening remarks." The trial court opined that "it would be prejudicial under the facts not to allow Mr. Feder to corroborate that." The court further held that Feder would be allowed to testify as to the similar deal he allegedly had with Holtzman. After Feder testified, the trial court instructed the jury as follows:

> Number one, there had been an issue made with regard to whether or not Mr. Davidson had told anyone of his alleged agreement with Mr. Holtzman. Mr. Feder's name was mentioned and I thought it fair, rightly or wrongly, to allow him to corroborate that.
>
> Secondly, with regard to Mr. Feder's claims, with regard to a contract with Mr. Holtzman, that is not to be deemed evidence as to the truth of the matter. Y'all are not trying the Arizona lawsuit.
>
> And further, that is not to be considered as evidence, that because of Mr. Feder's allegations that therefore that makes Mr. Davidson's allegations true. You're going to have a lot of evidence to consider. You're going to have to make some decisions, in part on credibility, and we'll charge you on that, but I just wanted to let you know that that testimony was for the purpose of corroboration that Davidson made the statement to Mr. Feder. Two, it was an attack on Mr. Holtzman's credibility. It's impeachment, showing inconsistent statements. And we allow testimony for that. But it can't be considered as proof or as evidence that a contract existed between Davidson and Holtzman, as alleged.

As stated earlier, the jury returned a verdict in favor of Davidson. Specifically, the jury found that Holtzman was liable under a breach of contract theory for the agreements regarding the sale of the franchise and the lawsuit. The jury awarded Davidson damages of $116,423.80 for the former agreement and $18,750 for the latter agreement. The jury further found that Davidson should be awarded prejudgment interest for both amounts, which interest the court calculated to be $61,089. Davidson was awarded a total judgment of $196,262.80.

Defendants filed a motion for a judgment notwithstanding the verdict, or in the alternative, a new trial, which motion was denied. Defendants moved for remittitur, which also was denied. This appeal followed.

### III. *Statute of Frauds*

-8-

Defendants first argue that the alleged oral agreement regarding the sale of the franchise[7] is barred by the Statute of Frauds because, so the argument goes, the contract was not to be performed within one year. Defendants contend that the parties had no expectation that Holtzman would sell the franchise within one year.

The Statute of Frauds provides, in pertinent part, as follows:

> No action shall be brought:
>
> *       *       *
>
> Upon any agreement or contract which is not to be performed within the space of one (1) year from the making of the agreement or contract; unless the promise or agreement, upon which such action shall be brought, or some memorandum or note thereof, shall be in writing, and signed by the party to be charged therewith, or some other person lawfully authorized by such party.

T.C.A. § 29-2-101(a)(5) (Supp. 1999). Because courts generally try to uphold contracts rather than defeat them, T.C.A. § 29-2-101(a)(5) is narrowly construed. *Price v. Mercury Supply Co.,* 682 S.W.2d 924, 932 (Tenn. Ct. App. 1984). "Accordingly, our courts have declined to construe a contract to require performance over more than one year if to do so would render the contract unenforceable because of the statute of frauds." *Id.* As this Court has held:

> The question is not what the probable, expected, or actual performance of the contract may be, but whether, according to the reasonable interpretation of its terms, it requires that it should not be performed within the year. Unless the court, looking at the contract in view of the surroundings, can say that in no reasonable probability can such agreement be performed within the year, it is its duty to uphold the contract.

*Boutwell v. Lewis Bros. Lumber Co.,* 27 Tenn. App. 460, 464, 182 S.W.2d 1, 3 (1944) (quoting 37 C.J.S. *Frauds, Statute of,* § 53, p. 561).

In the instant case, there is material evidence to support the jury's finding that, in return for Davidson's continued employment with the franchise, Holtzman promised that should he sell the franchise during Davidson's employment, he would pay Davidson five percent of the difference between the original purchase price paid by Holtzman and it sales price. Even though the parties may not have contemplated a sale of the franchise within one year of the making of the contract, we

---

[7]Defendants do not raise the Statute of Frauds as to the oral agreement regarding the law suit.

cannot say "that in no reasonable probability can such agreement be performed within the year." *See id.* As Holtzman admitted, the franchise *could* have been sold within the year. We agree. Accordingly, we find that the subject oral agreements do not run afoul of the Statute of Frauds. Defendants' argument on this issue is without merit.

## IV. *Definiteness of Parties' Understandings*

Next, defendants argue that the oral agreement regarding the sale of the franchise[8] was too indefinite to create an enforceable contract. Specifically, defendants charge that Davidson's testimony concerning the terms of the agreement was vague and that there was no evidence of mutual assent between the parties.

An oral agreement is enforceable, but the party seeking to enforce it must prove (1) mutual assent to the contract's terms and (2) that the terms are sufficiently definite to be enforceable. *Castelli v. Lien,* 910 S.W.2d 420, 426-27 (Tenn. Ct. App. 1995). As this Court stated in *Jamestowne on Signal, Inc. v. First Federal Savings & Loan Association,* 807 S.W.2d 559, 564 (Tenn. Ct. App. 1990):

> The contemplated mutual assent and meeting of the minds cannot be accomplished by the unilateral action of one party, nor can it be accomplished by an ambiguous course of dealing between the two parties from which differing inferences regarding continuation or modification of the original contract might reasonably be drawn. In addition, a mere expression of intent or a general willingness to do something does not amount to an "offer."
>
> Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.
>
> The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.
>
> The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance.

*Id.* (quoting in part Restatement (Second) of Contracts § 33) (citations omitted).

---

[8]Again, defendants raise this argument only as to the agreement regarding the sale of the franchise, not the lawsuit.

We find that there is material evidence to support a finding of an oral contract by which Holtzman promised to pay Davidson five percent of the difference between the purchase price and the sales price of the Chattanooga franchise. Setting aside for the moment the issue of Feder's testimony -- which we will address separately -- the only evidence presented at trial regarding the parties' agreement was the testimony of the parties and their correspondence after the agreement was allegedly made. Because the parties' testimony was sharply conflicting, the jury was required to assess the credibility of the witnesses. It is apparent from the verdict that the jury was not impressed with Holtzman's version of the parties' dealings or his explanation that his responses to Davidson's correspondence were in regard to compensation owed for consultation. We are not in a position to assess witness credibility. *See Reynolds v. Ozark Motor Lines, Inc.,* 887 S.W.2d 822, 823 (Tenn. 1994).

The correspondence between the parties also supported the jury's finding of an oral contract. In his responses to Davidson's repeated requests for payment, Holtzman acknowledges that Davidson is owed some compensation; he refers to "the issue of the 'benefits'" and states that he has "always tried to 'do the right thing' regarding financial issues." Although Holtzman introduced three memoranda at trial in which he denies the existence of any agreement, the jury was free to disregard them. The validity of these documents was highly questionable given that they were not produced during discovery and that Davidson denied receiving any of them.

Defendants rely upon *Jamestowne on Signal, Inc. v. First Federal Savings & Loan Association,* 807 S.W.2d 559 (Tenn. Ct. App. 1990) to argue that the terms of the parties' agreement are too indefinite to be enforceable. In *Jamestowne,* the alleged oral agreement involved the loaning of a substantial amount of money in excess of the parties' written loan agreement. *Id.* at 559, 564. This Court held that the evidence regarding the parties' dealings was too indefinite to create an enforceable contract as a matter of law because there was no proof as to "the essential elements of such a loan, such as the amount to be loaned, the duration of the loan, how it was to be repaid, the rate of interest to be paid and when, what security, if any, was to be given." *Id.* at 564-65. Defendants argue that, like *Jamestowne*, the parties in the instant case were engaged in a loan transaction that was too indefinite to be enforced. In arguing that the agreement was in fact a loan, defendants cite Davidson's April 8, 1996, letter to Holtzman, which states, in pertinent part, as follows:

> If my notes are accurate, I believe that in the fall of 1988 we agreed that I would have an equity position with the Midland franchise of 5%. *The money for this stock acquisition was loaned to me with payment due upon sale of the franchise.*
>
> When I relocated to Chattanooga in the fall of 1989, the equity position was transferred from the Midland franchise to the Chattanooga franchise under the same terms.

-11-

(Emphasis added).

There is material evidence to support a finding that the parties' agreement was not contemplated as a loan; rather, it was an agreement that, upon the sale of the franchise, Davidson would receive five percent of the net profit derived from the sale. Davidson admitted that his April, 1996, letter characterized the agreement as a loan; however, he explained that viewing it as a loan was just one way that his five percent share of the net profit Holtzman received from the sale of the franchise could be calculated. Viewing the transaction as a loan, Davidson would receive five percent of the purchase price of $3.75 million, from which $55,000 -- the cost of five percent of the stock at the price Holtzman originally paid for it -- would be deducted and "repaid" to Holtzman. Under this analysis, Davidson would receive $132,500 for his five percent equity. Davidson testified that his share could also be calculated simply by taking five percent of $2,650,000, the difference between the original purchase price and the sales price, which also results in Davidson receiving $132,500.

In sum, we find that the terms of the parties' contract are sufficiently definite to be enforceable. There is material evidence to support a finding of mutual assent. Defendants' arguments on this issue are without merit.

## V. *Evidentiary Issues*

Finally, defendants argue that the trial court erred in admitting certain testimony of Michael Feder. Specifically, they object to Feder being allowed to testify regarding statements made to him by Davidson about Davidson's oral agreement with Holtzman. They also object to Feder testifying that he too had an oral agreement with Holtzman that is similar in its terms to the agreement that Holtzman allegedly had with Davidson. We will consider each of these arguments in turn.

## A. Davidson's Statements to Feder

We find no error in the trial court's decision to allow Feder to testify regarding statements made by Davidson to Feder about the former's agreement with Holtzman. When a witness' credibility is attacked by a suggestion that the witness' testimony is fabricated or is a deliberate falsehood, a prior consistent statement may be introduced for the sole purpose of corroborating the witness' testimony. *State v. Hodge,* 989 S.W.2d 717, 725 (Tenn. Crim. App. 1998); *State v. Robinson,* 971 S.W.2d 30, 43 (Tenn. Crim. App. 1997). It appears from the trial court's remarks in ruling on defendants' motions *in limine* that defendants' counsel attacked Davidson's credibility in his opening statement to the jury and again on cross-examination by suggesting that Davidson had not told anyone about his agreement with Holtzman. Because of this attack on Davidson's credibility, Feder's testimony was admissible as a prior consistent statement for rehabilitative purposes. *See State v. Livingston,* 907 S.W.2d 392, 398 (Tenn. 1995); *Hodge,* 989 S.W.2d at 725; *State v. Meeks,* 867 S.W.2d 361, 374 (Tenn. Crim. App. 1993).

Even if the admission of Feder's testimony regarding what Davidson told him was error, we find that any such error was harmless. A final judgment shall not be set aside unless, "considering the whole record, error involving a substantial right more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b). Accordingly, we will not reverse on the basis of improper admission of evidence unless it affirmatively appears that the error affected the result of the trial. *Keith v. Murfreesboro Livestock Mkt., Inc.,* 780 S.W.2d 751, 758 (Tenn. Ct. App. 1989). Before Feder testified as to his conversation with Davidson, the jury had already become aware that Davidson had told Feder about the details of Davidson's arrangement with Holtzman; this came out as a result of questions posed to Davidson by defendants' counsel on cross-examination. The following excerpt from the transcript starts with that counsel's reference to Davidson's deposition testimony:

> Q    Page 26, line 11, Question: Okay. *Other than Mike Feder, did you ever tell anyone else about Holtzman, about your agreement with Holtzman regarding the percentage of the net profit?* Your answer?
>
> A    My answer was, no.
>
> *          *          *
>
> Q    Well, let me go back because maybe I didn't read this well. The question was: *Other than Feder did you ever tell anyone*? The answer was no.
>
> The next question, what was my question?
>
> A    Did you ever tell your wife, your ex-wife?
>
> Q    And what was your first answer?
>
> A    My first answer was no.

(Emphasis added). The substance of what Feder later testified to was put before the jury by defendants' own counsel; accordingly, we find that the admission of Feder's testimony on this point, even if error, was harmless.

## B. Feder's Testimony Regarding His Deal With Holtzman

We also find that the trial court did not err in allowing Feder to testify as to the similar arrangement he claimed to have with Holtzman. On cross-examination, Holtzman was asked, *without objection*, whether he had any agreements with any other general managers to pay them a percentage of the net profit derived from the sale of the franchise. Holtzman denied having any other such arrangements. Generally, evidence of extrinsic transactions that have no connection with the

transaction at issue is inadmissible. **Keith,** 780 S.W.2d at 756. Defendants' counsel, however, failed to object to this line of questioning posed to his client by opposing counsel on cross-examination. By failing to make a contemporaneous objection, defendants waived the issue of the admissibility of this evidence. *See **State v. Rhoden,*** 739 S.W.2d 6, 11 (Tenn. Crim. App. 1987). Thus, the issue of whether Holtzman had made similar arrangements with other employees was before the jury, and Davidson sought to impeach Holtzman on this issue by introducing Feder's testimony regarding his alleged agreement with Holtzman. While evidence of such extrinsic transactions is normally inadmissible, the evidence was admissible in this case by virtue of the fact that the initial testimony was elicited without objection. Therefore, Holtzman's alleged deal with Feder was properly admitted in order to impeach him.

## VI. *Conclusion*

The judgment of the trial court is affirmed. Costs on appeal are taxed to the appellants. This case is remanded for enforcement of the judgment and collection of costs assessed below, all pursuant to applicable law.

_____
CHARLES D. SUSANO, JR., JUDGE