# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
July 23, 2002 Session

## STATE OF TENNESSEE v. RAYMOND WRITER

**Direct Appeal from the Criminal Court for Sullivan County**
**No. S42,614     Phyllis H. Miller, Judge**

_____

**No. E2001-01062-CCA-R3-CD**
**June 10, 2003**
_____

A Sullivan County jury convicted the defendant, Raymond Writer, of rape of a child. The trial court accordingly sentenced the defendant to serve twenty-five years for this conviction at 100%, as mandated by statute. The defendant now brings this direct appeal of his conviction, challenging (1) the trial court's decision to allow the prosecution to impeach defense witness Gwen Bunnell, (2) the trial court's decision to allow the testimony of two physicians who repeated the victim's statements identifying the defendant as the perpetrator, (3) the trial court's decision to allow the prosecution to introduce the rebuttal testimony of Amy Harris, and (4) the cumulative effect of these testimonies as unduly prejudicial. For the following reasons, we find that none of his allegations merit relief.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, DAVID H. WELLES concurred in results joined by JOE G. RILEY, JJ.

George Todd East and T. Martin Browder, Jr., Kingsport, Tennessee, for appellant, Raymond Writer.

Paul G. Summers, Attorney General & Reporter; Elizabeth B. Marney, Assistant Attorney General; Greeley Wells, District Attorney General; and Teresa M. Smith, Assistant District Attorney General, for appellee, State of Tennessee.

## OPINION

### Factual Background

The victim, who was four-years-and-eleven-months-old at the time that he reported his abuse, is the grandson of Gwen Bunnell.[1] The defendant had been co-habiting with Ms. Bunnell for the past nineteen years at the time of trial. The victim would frequently visit Ms. Bunnell and the defendant

_____

[1]It is the policy of this court to refrain from referring to child abuse victims by name.

in their home and would often spend weekend nights with the two. The victim referred to the defendant as his "grandpa" and had a close relationship with him.

On March 20, 1998, the victim's mother, Shannon Simms, brought the victim to his pediatrician, Dr. Mark DeMoss, for a physical that was required prior to the victim's enrollment in kindergarten. As part of this physical, the victim received his required booster shots. During the exam, Ms. Simms asked Dr. DeMoss for advice regarding cleaning the victim's un-circumcised penis. Dr. DeMoss advised Ms. Simms that she should begin to slowly work back the victim's foreskin to facilitate cleaning. Subsequent to this visit, Ms. Simms began to attempt to work the victim's foreskin back. On one such occasion, the victim exclaimed "[d]on't do what grandpa does." The victim then explained to his mother what his grandfather had done to him, and Ms. Simms immediately scheduled an emergency appointment with Dr. DeMoss.

The victim met with Dr. DeMoss during an appointment on March 26, 1998. Ms. Simms informed Dr. DeMoss of the victim's claims, and Dr. DeMoss then proceeded to question the victim. In response to Dr. DeMoss's open-ended questions, the victim told Dr. DeMoss that while he had been at his grandparents house in their bathroom, his grandfather had placed his "big" penis inside the victim's "bottom," meaning his rectum. The victim also recounted seeing "poop," or stool, on the defendant's penis after penetration. The victim described the experience as painful, indicating that it felt as if his "butt were exploding." Dr. DeMoss then conducted a physical exam of the victim. Dr. DeMoss discovered that the victim's outer rectal muscle opened easily, which he described as abnormal, and also discovered that the defendant's rectal area contained scar tissue, indicating repeated trauma over an extended period of time. After completing his exam, Dr. DeMoss contacted the Department of Children Services.

In response to Dr. DeMoss's referral, a case worker from the Department of Children's Services interviewed the victim. Subsequently, Children's Services referred the victim's case to Dr. John Heise, another pediatrician, who also interviewed and examined the victim. The victim told Dr. Heise that the defendant had put his "pee pee" in the victim's "butt," which were the words, as Dr. Heise explained, that the victim used to refer to a penis and the buttocks area. During his physical examination of the victim, Dr. Heise discovered that the folds in the victim's rectal muscles had been flattened, meaning that they had been stretched out and folded. Dr. Heise also noted some scar tissue on the defendant's rectal muscles. Dr. Heise described both of these conditions as abnormal and indicative of penetration.

The victim testified at trial. He repeated his earlier allegations of the defendant's sexual abuse. While he identified the defendant as his abuser by name, he was unable to positively identify the defendant at trial. He was approximately seven-years-old at the time of trial and had not seen the defendant since he made these allegations, approximately two years prior to trial.

Ms. Gwen Bunnell, the defendant's live-in girlfriend of then nineteen years, testified on the defendant's behalf. She stated that the defendant and the victim enjoyed a very close and loving relationship and that the defendant had never had the opportunity to molest the victim. She

recounted one instance, a Saturday night before she, the defendant, and the victim all went to the Knoxville Zoo on a Sunday. She was so excited about the upcoming event that she did not sleep. She remained in the room where she, the defendant, and the victim all slept, and she did not witness any molestation. Furthermore, she stated that the defendant had never been alone with the victim in their bathroom and therefore would not have had the opportunity to molest the victim there. Ms. Bunnell further testified that when she initially learned that the victim had named the defendant as his molester, she became angry enough to "kill him." However, after speaking with Dr. Heise, who reportedly told her that the abuse had happened within a couple of weeks of his exam, she recognized that the defendant had not had an opportunity to molest the victim and therefore must not have been his abuser. Ms. Bunnell speculated that the victim must have identified the defendant as his perpetrator because he had been consistently persuaded to do so over a long period of time. Furthermore, as further proof of the defendant's innocence, Ms. Bunnell testified that the defendant had never demonstrated any signs of being a child molester. In response to this last statement, the prosecutor questioned Ms. Bunnell about an incident in which the defendant admitted to her that he had digitally penetrated Ms. Simms, Ms. Bunnell's daughter, when Ms. Simms was between the ages of eleven and fourteen. Ms. Bunnell admitted that she did have knowledge of this incident.

The defendant also testified on his own behalf. He denied having committed the instant crime and also speculated that the victim had identified him as his molester because he had been persuaded to do so.

At the close of the defendant's proof, the state introduced the rebuttal testimony of Amy Harris, the Department of Children Services caseworker who interviewed the victim. The state introduced Ms. Harris's testimony to rehabilitate the victim's testimony, which had been impeached by Ms. Bunnell's and the defendant's allegations that he had lied because he had been persuaded to do so. Ms. Harris testified that she interviewed the victim when his parents were neither present nor visible to the victim. Ms. Harris asked the victim about his doctor's visit with Dr. DeMoss, which had occurred the day before, and the victim responded that the visit was "bad news for his butt." The victim further explained that his "grandpa stuck his pee pee in his butt," and that his grandpa was "Grandpa Writer."

After hearing this proof, the jury convicted the defendant as charged. As aforementioned, the trial court subsequently sentenced the defendant to serve twenty-five years for his conviction at 100%. The defendant now appeals his conviction, arguing that the trial court improperly allowed the state to impeach Ms. Bunnell with evidence of her knowledge of the victim's prior bad act, that the trial court improperly allowed the testimony of the two physicians who repeated the victim's identification of the defendant as his molester, that the trial court improperly allowed the state to introduce Amy Harris's testimony as rebuttal evidence, and that the cumulative effect of these four testimonies was unduly prejudicial to the defendant. After a thorough review of the record, we find that none of the defendant's allegations merit relief.

**Impeachment of Gwen Bunnell**

The defendant challenges the trial court's decision to allow the state to impeach the defense witness Gwen Bunnell by questioning her about her knowledge of the defendant's admitted prior bad act, namely his sexual assault of Ms. Simms, Ms. Bunnell's daughter and the victim's mother. The state responds that the trial court correctly allowed the state to cross-examine Ms. Bunnell on this matter because the defendant had opened the door to allow discussion of the issue and that the court also correctly gave a limiting instruction to the jury after the admission of this evidence.

Tennessee Rule of Evidence 404(a), which addresses the admissibility of character evidence, provides:

> (a) . . . Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity with the character or trait on a particular occasion, except:
>
> (1) . . . Evidence of a pertinent character trait offered by the accused or by the prosecution to rebut the same.

Tenn. R. Evid. 404(a)(1). The treatise <u>Tennessee Law of Evidence</u> elaborates on this exception to the general ban on character evidence of the accused, explaining that Rule 404(a)(1) embodies a very important exception to this general bar on the admissibility of character evidence of the accused. Neil P. Cohen, et al., <u>Tennessee Law of Evidence</u> § 4.04[4][a] (4th ed. 2000). This exception allows admission of character evidence when the accused "opens the door" by introducing evidence to prove a "pertinent" character trait, inevitably to demonstrate his or her own good character. <u>Id.</u> However, the accused is only allowed to introduce evidence of a "pertinent" character trait, meaning a character trait at issue in the trial. <u>Id.</u> § 4.04[4][b]. For example, the accused's character for honesty would be a pertinent character trait if he or she were charged with embezzlement. <u>Id.</u> Once the accused introduces evidence of his or her own good character, the state may also address the issue of the accused's character in order to prevent the trier of fact from receiving a one-sided view of the defendant's character. <u>Id.</u> § 4.04[4][a]. Furthermore, the defendant's proof under Rule 404(a)(1) is limited to reputation and opinion evidence only. <u>Id.</u> § 4.04[4][c]. However, under Rule 405(a), the state may introduce evidence of specific instances of conduct when cross-examining a defense witness in response to the presentation by the accused of this reputation or opinion character evidence. <u>Id.</u>

In the instant case, in response to a question posed by defense counsel during direct examination, Ms. Bunnell testified that she did not believe that the defendant was guilty of the crime at issue because she did not believe that he had the opportunity to commit the alleged offenses and because the defendant "had never showed [sic] any signs of being a child molester." Accordingly, through this testimony, we find that the defendant opened the door to the issue of a pertinent character trait, namely the defendant's propensity for molesting children. The state then sought to cross-examine Ms. Bunnell by questioning her about her knowledge of the defendant's admission to her that he had digitally penetrated Ms. Simms when Ms. Simms was a "teenager," between the ages of eleven and fourteen. Before allowing the state to cross-examine the witness on this subject,

the trial court held a jury-out hearing to determine whether such cross-examination would be appropriate.

After the state questioned Ms. Bunnell during the jury-out hearing in order to make an offer of proof, the trial court heard counsel's arguments and then found that the testimony was admissible to impeach Ms. Bunnell's credibility. The trial court found that Ms. Simms was between the ages of eleven and fourteen when she reported to Ms. Bunnell that the defendant had digitally penetrated her vagina, which the defendant admitted to be true, and that this testimony was relevant to impeach Ms. Bunnell, who had testified that she had no knowledge of the defendant's propensity to molest children. The trial court found that Ms. Simms was a minor at the time of this incident and that therefore Ms. Bunnell's knowledge of this incident was relevant to the credibility of her opinion of the defendant as an individual unlikely to have sexual contact with minors. The trial court further announced its intent to give the jury a limiting instruction immediately following Ms. Bunnell's testimony, instructing them that they should only consider this evidence of the defendant's prior bad act for impeachment purposes and not for the purpose of demonstrating the defendant's propensity to commit the crime at trial.

We find that the trial court properly allowed the state to cross-examine Ms. Bunnell about her knowledge of the defendant's prior bad act. The defendant opened the door to the issue of this character trait by introducing Ms. Bunnell's testimony, who responded during direct examination that the defendant had never evidenced any indication of a propensity towards sexual interaction with minors. The introduction of this witness's opinion testimony allowed the state to cross-examine this witness by questioning her about her knowledge of the defendant's specific acts, per Rule 405(a). See, e.g., State v. Patton, 593 S.W.2d 913 (Tenn. 1979) (finding that the trial court correctly allowed the state to cross-examine the defendant about his prior acts of violence after a defense witness testified during direct examination that the defendant could not remember the events of the crime because he could not remember things "foreign to his nature," which the supreme court interpreted to mean that the witness was stating that violent acts were foreign to the defendant's nature).

Finally on this point we note that in State v. Nichols, 877 S.W.2d 722, 732 (Tenn. 1994), a capital murder case, our supreme court found that the state's introduction of an assault conviction was permissible to rebut evidence introduced by the defendant of his peaceable character. The supreme court upheld the trial court's admission of this evidence under Tennessee Rule of Evidence 404(b), the provision addressing the admission of an accused's prior bad acts. However, the authors of Tennessee Law of Evidence opine that "perhaps a more accurate rationale [for upholding the admission of this evidence] was that the evidence constituted a specific act admissible on cross-examination under Rule 405(a) to counter character evidence admissible under Rule 404(a)." Cohen et al., supra, § 4.04[4][c].

We find that the trial court's in-depth findings made during a jury-out hearing substantially comply with the mandates of Rule 404(b). Under either rationale we find the prosecutor's question to Ms. Bunnell proper. Moreover, the trial court's jury instruction that immediately followed this testimony properly advised the jury of the appropriate context in which to consider this testimony.

As the trial court correctly noted, a jury is presumed to follow the court's instructions absent evidence to the contrary. See State v. Vanzant, 659 S.W.2d 816, 819 (Tenn. Crim. App. 1983). Accordingly, we find that this issue lacks merit.

## Testimony of Medical Doctors

The defendant contends that the trial court erroneously allowed Drs. DeMoss and Heise, two physicians who examined the victim pursuant to his allegations of sexual abuse, to testify that the victim identified the defendant as his abuser during their examinations. The defendant argues that this evidence is inadmissible hearsay that does not fall within the hearsay exception for statements made for the purpose of medical diagnosis and treatment. See Tenn. R. Evid. 803(4).

As a general matter, the admissibility of the evidence rests within the sound discretion of the trial court. See State v. Sheline, 955 S.W.2d 42, 46 (Tenn. 1997). This court will not reverse the trial court's ruling absent an abuse of discretion. See State v. Campbell, 904 S.W.2d 608, 616 (Tenn. Crim. App. 1995). Tennessee Rule of Evidence 803(4) allows the admission of otherwise inadmissible hearsay by permitting the admission of statements made for the purposes of medical diagnosis and treatment. See Tenn. R. Evid. 803(4). Rule 803(4) allows admission of the following statements:

> Statements made for purposes of medical diagnosis and treatment describing medical history; past or present symptoms, pain, or sensations; or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis and treatment.

Id. These statements are deemed reliable enough to be admissible because the motivation to receive appropriate medical care is thought to be more compelling than the motivation to lie. See State v. Stinnett, 958 S.W.2d 329, 331 (Tenn. 1997). Moreover, if a medical professional relied on these statements, such reliance gives the statements a further indicia of trustworthiness. See id.

Before a hearsay statement in a case such as this may be admitted under Rule 803(4), the trial court must first determine that the statement was made for the purpose of medical diagnosis and treatment. State v. Livingston, 907 S.W.2d 392, 396 (Tenn. 1995); see also Ruff v. State, 978 S.W.2d 95, 98 (Tenn. 1998) (noting that "[b]ecause a prior complaint constitutes hearsay, it is not admissible as substantive evidence unless it satisfies some hearsay exception"; thus, Livingston did not create a new hearsay exception). Thus, statements made to a physician whose sole role is to diagnose or evaluate the declarant's condition, as opposed to statements made to one whose role is to both diagnose and treat the declarant, are inadmissible in Tennessee. See State v. McLeod, 937 S.W.2d 867, 873 (Tenn. 1996).

Courts must evaluate all the circumstances surrounding a statement to determine if the statement was made for the purposes of medical diagnosis and treatment. This test is equally

applicable to both child- and adult-declarants. See State v. McLeod, 937 S.W.2d 867, 870 (Tenn. 1996); Cohen et al., supra, § 8.09[5]. However, statements made by child-declarants deserve special scrutiny because "the child's ability to articulate the reason for the statement may be affected by age or developmental maturity." Stinnett, 958 S.W.2d at 331-32 (citing McLeod, 937 S.W.2d at 870). The trial court should hold a jury-out hearing in order to make an admissibility determination, and when making this determination, the trial court should ensure that the hearsay statement was not "improperly influenced by another, made in response to leading or suggestive questions, or inspired by a custody battle or family feud." Stinnett, 958 S.W.2d at 332.

Here, the victim saw Dr. DeMoss within a week of when he reported his abuse to his mother, Ms. Simms. During his visit, Dr. DeMoss spoke with the victim about his abuse, asking open-ended and non-leading questions as he was trained to do, and in response to this inquiry, using child-like terms for the various body parts, the victim told Dr. DeMoss that the defendant had penile-anal intercourse with him. Once the defendant reported this abuse, Dr. DeMoss conducted an exam of the victim, closely examining his rectal area, and discovered abnormal findings. Specifically, the victim's rectal muscles opened very easily and his rectal muscles were scarred, indicating penetration on at least several occasions. Dr. DeMoss then referred the victim's case to the Department of Children's Services.

After a meeting with a Children Services case-worker, the defendant met with Dr. Heise, a pediatrician who has specialized training in the treatment of children who have been sexually abused. Dr. Heise examined the victim pursuant to a referral from Children Services. He questioned the victim about what had happened to him, and the victim responded as he had with Dr. DeMoss by stating that the defendant had put his "pee pee" in the victim's "butt," meaning that the defendant had penile-anal intercourse with the victim. After talking with the victim, Dr. Heise conducted a physical exam of the victim. During this exam, Dr. Heise noted that the defendant's rectal muscles appeared abnormal and were scarred.

After conducting his physical exam, Dr. Heise had the victim tested for several sexually transmitted diseases and referred him to the Children's Advocacy Treatment Center for psychological treatment. Dr. Heise explained that although he received the victim as a patient pursuant to a referral from the Department of Children Services, the purpose of his exam was "to find out what [had] happened and if [he] needed to . . . start some treatment." Dr. Heise explained that his sole purpose was to help the child and that he wasn't "beholden" to anyone.

Based on the facts above, we find that the victim made statements to both physicians for the purposes of medical diagnosis and treatment. Dr. DeMoss saw the victim immediately after Ms. Simms learned that the victim had potentially been abused. During the victim's visit, Dr. DeMoss questioned the victim in order to learn what had happened to him. Dr. DeMoss noted that based on his training, he believed that the victim was being truthful with him when making his report. Based on the victim's allegations, Dr. DeMoss conducted a thorough physical exam of the victim in order

to determine if he had suffered any physical harm due to this abuse. Dr. DeMoss discovered that the victim's rectal area indicated signs of abuse, but did not indicate that these required treatment. He then referred the victim's case to the Department of Children Services as he was obligated to do. We find that Dr. DeMoss examined the victim for the purpose of diagnosing the victim and treating any of his treatable physical ailments.

We also find that the victim made statements to Dr. Heise for the purpose of medical diagnosis and treatment. Although Dr. Heise received the defendant's case pursuant to a referral from Children Services, he indicated that his purpose in examining the victim was to ensure the victim's well-being and that he was not obligated to any purpose other than the welfare of the victim. Furthermore, after examining the victim, Dr. Heise had the victim tested for several sexually transmitted diseases and referred him to a local counseling service, thereby treating aspects of the victim's physical and mental health. Thus, we find that Dr. Heise's purpose was more than to merely evaluate the victim's condition, but to treat him as well.

Finding, however, that the victim's identification of the defendant was made during the course of a medical visit for both diagnostic and therapeutic purposes does not end our inquiry. In State v. Livingston, 907 S.W.2d 392, 396 (Tenn. 1995), our supreme court addressed the issue of whether statements made by a child-declarant identifying the child's abuser are admissible under Rule 803(4). Id. Adopting this Court's analysis, the supreme court stated that the name and identity of a child-declarant's sexual abuser is reasonably pertinent to diagnosis and treatment if the abuser is a member of the child-declarant's household. Id. If the abuser is a member of the child's household, it becomes necessary to establish the identity of the abuser in order to prevent the child from being returned to the abuser and to properly treat the emotional and psychological effects of such abuse. Id. However, before this hearsay is admitted, the trial court must determine that there is a

> "sufficient indicia of the declarant's proper motivation to ensure the trustworthiness of her statements to the testifying physician." Such a situation could exist where the physician "makes clear to the victim that the inquiry into the identity of the abuser is important to diagnosis and treatment, and the victim manifests such an understanding."

Id. (quoting United States v. Renville, 779 F.2d 430 (8th Cir. 1985)). While the supreme court adopted the analysis above, in a footnote the court stated that "[i]n order to properly diagnose and treat a child, circumstances may suggest that it is equally important to discover the identity of the perpetrator without regard to residence. We do not decide that issue here." Id. at 397 n.4.

Here, although the victim did not share a household with his alleged abuser, the defendant, on a daily basis, the victim routinely spent weekends at the defendant's house and frequently spent

time at the defendant's house during the work-week. Furthermore, Ms. Simms, Ms. Bunnell, and the defendant all testified that the defendant enjoyed a very close and loving relationship with the victim before the victim reported his abuse. As noted above, the Livingston court found that a hearsay statement made for purposes of medical diagnosis and treatment identifying a child-declarant's sexual abuser is admissible under Rule 803(4) because the identity of the abuser is necessary for medical treatment and diagnosis in order to prevent the abuser's future interaction with the child and to be able to provide appropriate emotional and psychological care. See id. at 396. Accordingly, because the defendant had regular access to the victim and because the victim and the defendant had a close relationship similar to one that the victim might develop with a member of his household, we find that the victim's statements identifying the defendant would be not be barred as hearsay and may be admitted under the rationale for admitting such statements in Livingston. See, e.g., State v. Kenneth Chambly, No. E2000-01719-CCA-R3-CD, 2001 WL 1028831, at *4-*5 (Tenn. Crim. App. at Knoxville, Sept. 7, 2001) (finding that the identity of a child's sexual abuser may be relevant, as it was in the instant case, although the abuser was not a member of the victim's household; the fact that the defendant had routinely abused the victims and had regular access to them made his identity relevant to the victims' medical diagnosis and treatment); c.f. State v. Calvin Grady Purvis, No. CCA-02C01-9412CC00278, 1995 WL 555052, at *6 (Tenn. Crim. App. at Jackson, Sept. 20, 1995) (finding that the state had failed to establish sufficient facts in this case to warrant an expanded reading of Renville; the state had failed to present sufficient proof that the victim was "vulnerable to a perpetrator outside the family setting," nor did the state "demonstrate that the statement of identity was made relative to the victim's motivation for treatment and diagnosis").

In cases involving child-declarants in sexual abuse cases, our supreme court has apparently found that, although the hearsay statements of the child were made during the course of a medical visit for diagnosis and treatment, because the declarant is a child special care must be taken to insure the child understands the importance of giving the physician accurate information. Specifically, as noted above, Livingston cited language from the Eighth Circuit opinion United States v. Renville giving an example of a situation in which the trial court could conclusively find that the statement at issue was reliable. "Such a situation could exist where the physician 'makes clear to the victim that the inquiry into the identity of the abuser is important to diagnosis and treatment, and the victim manifests such an understanding.'" Livingston, 907 S.W.2d at 396 (quoting Renville, 779 F.2d at 438). When making this pronouncement, the Renville court rationalized that a child who understood that the correct identification of his or her abuser was necessary to his or her medical diagnosis and treatment would be more likely to be truthful when making the identification. See Renville, 779 F.2d at 438. In other words, if a trial court can determine that a declarant understood that his or her statement was imperative to receiving proper medical treatment, a trial court may place more credibility on this statement because a declarant's motivation for being truthful in order to obtain proper diagnosis and treatment is considered a greater motivation than the motivation to lie. The same rationale supports the admission of other hearsay statements made for the purpose of diagnosis and treatment. See id. at 438.

When Dr. DeMoss examined and interviewed the victim, the victim reported the identity of his abuser as the defendant in response to several open-ended and non-leading questions posed by Dr. DeMoss. Dr. DeMoss noted that the victim's lively demeanor became markedly subdued when Dr. DeMoss began questioning the victim about the incident. Dr. DeMoss also testified that based on his training and experience evaluating the truthfulness of children's statements, the victim was telling him the truth. However, Dr. DeMoss did not further question the victim about the identity of the abuser and did not explain to the victim the importance of an accurate identification. Rather, the victim's identification of the defendant as his abuser appears to be volunteered rather than solicited information, and Dr. DeMoss did not pursue a line of questioning on this subject. Accordingly, under the rationale announced in Renville and repeated in Livingston, the identification was not as reliable as an identification made with an understanding that the identification was imperative to the child victim's well-being. Thus, the trial court should not have allowed admission of the victim's statement to Dr. DeMoss identifying the defendant. However, as discussed infra, we find that this error was harmless.

Turning next to Dr. Heise's testimony in which Dr. Heise repeated the victim's statement identifying the defendant as his abuser, we find that Dr. Heise made the victim sufficiently aware of the importance of a correct identification to support the trial court's admission of this statement. Specifically, before Dr. Heise questioned the victim, he explained to the victim what his examination would include and the reasons behind each aspect of the exam. During the victim's interview, it appears that Dr. Heise asked the victim several questions about the identity of his abuser and also specifically verified through questioning that there were no other individuals who could have abused or did abuse the victim. Based on Dr. Heise's thorough and skilled questioning of the victim due to his specialization in cases of reported child sexual abuse, we find that the trial court properly admitted the statements made to Dr. Heise identifying the defendant.

## Rebuttal Testimony of Amy Harris

The defendant argues that the trial court erred by allowing the state to introduce the testimony of Amy Harris, a Department of Children Services caseworker, as rebuttal evidence. The state introduced this testimony in order to rehabilitate the character of the victim after both Ms. Bunnell and the defendant suggested that the victim had lied about his abuser's identity. The state first responds by noting that the defendant has failed to cite to the record or to any authority in support of his argument of this issue. Second, the state notes that the trial court properly allowed the contested testimony for rehabilitation of the victim's character. We agree with the state.

In his cursory argument of this issue, the defendant fails to make any citations to the record or to any applicable law. Accordingly, he has waived this issue on appeal. See Tenn. R. App. P. 27(a)(7). Furthermore, even if the defendant had not waived this issue, we find that the issue nevertheless lacks merit.

As noted above, the victim testified at trial. He stated that the defendant had sexually abused him several years earlier. During cross-examination, defense counsel asked the victim questions suggesting that the victim's father or another adult had abused the victim. Defense counsel also suggested during questioning that someone had persuaded the victim to name the defendant as his abuser. Ms. Bunnell, who testified for the defendant at trial, speculated that the victim must have identified the defendant as his abuser because he was coached into doing so. She opined that someone must have "scared him into saying it. That he was so afraid of them that he would say whatever they wanted him to." She stated that this could be accomplished "if you do it every single day, and don't let up on them, they remember what you tell them to say if you hold them down and make them listen and they're afraid of you." The defendant also speculated that the victim had been coached into claiming that he was the victim's sexual abuser, stating that "I don't know who put him up to saying my name, but I know I didn't do it."

In response to this credibility attack, the state sought to introduce the testimony of Amy Harris, a caseworker who had interviewed the victim. In his interview with Ms. Harris, the victim named the defendant as his abuser. Therefore, the state proposed introducing her testimony to offer a prior consistent statement of the victim naming the defendant as his abuser. Ms. Harris interviewed the victim outside of the presence, sight, or hearing of his family members. Accordingly, the trial court found that her testimony was relevant to prove that the victim's identification of the defendant was not coached or a product of coercion.

The trial court relied on State v. Hodge, 989 S.W.2d 717 (Tenn. Crim. App. 1998), and Davidson v. Holtzman, 47 S.W.3d 445 (Tenn. Ct. App. 2001), when ruling that Ms. Harris's testimony was admissible to rehabilitate the victim's character. Both of these authorities support the proposition that evidence of a prior consistent statement is admissible to bolster a witness's testimony when that witness's character has been attacked by recent insinuations of falsehood and fabrication. See Davidson, 47 S.W.3d at 455; Hodge, 989 S.W.2d at 725. Because the defendant alleged that the victim had made recent fabrications or falsehoods through his cross-examination of the victim, his own testimony, and Ms. Bunnell's testimony, we find that the trial court properly determined that Ms. Harris's testimony was admissible to rehabilitate the victim's character by introducing the victim's prior consistent statement made to her. Thus, this issue lacks merit.

### Sufficiency of the Evidence

The defendant alleges that the cumulative effect of the erroneously admitted identification statements made in the testimonies of both doctors and Ms. Harris, coupled with the victim's inability to positively identify him in court as the victim's abuser, amount to his conviction being based on insufficient evidence. We disagree and find that there is sufficient evidence to support the defendant's conviction.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. A verdict of guilty, rendered by a jury and "approved by the trial judge, accredits the testimony of the" state's witnesses and resolves all conflicts in the testimony in favor of the state. State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994); State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, although the accused is originally cloaked with a presumption of innocence, the jury verdict of guilty removes this presumption "and replaces it with one of guilt." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). Hence, on appeal, the burden of proof rests with the defendant to demonstrate the insufficiency of the convicting evidence. Id. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. See Tenn. R. App. P. 13(e); Harris, 839 S.W.2d at 75. In making this decision, we are to accord the state "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." See Tuggle, 639 S.W.2d at 914. As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. State v. Morgan, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." Matthews, 805 S.W.2d at 779.

The defendant alleges that the victim's inability to identify him in court as his grandfather and abuser negates the sufficiency of the evidence supporting his conviction. However, we first note that the victim was seven-years-old at the time of trial and had not seen the defendant in approximately two years. Therefore, his failure to identify the defendant may be explained by his young age and the amount of time that lapsed between the trial and his last contact with the defendant. Second, the jury's verdict of guilt accredited the testimony of the state's witnesses, including the victim. Cazes, 875 S.W.2d at 259; Harris, 839 S.W.2d at 75. Such credibility determinations are beyond the scope of this court's review. See State v. Jones, 15 S.W.3d 880, 888 (Tenn. Crim. App. 2000). Thus, this aspect of the defendant's sufficiency challenge lacks merit.

Furthermore, as discussed earlier in this opinion, we find that the trial court properly admitted the victim's hearsay statements made to Dr. Heise and that the admission of the victim's hearsay statements made to Dr. DeMoss was harmless in light of the strong evidence against the defendant and the availability of the victim for cross-examination regarding these statements. The state introduced several pieces of incriminating evidence against the defendant. The victim's mother testified that the victim identified the defendant as his abuser;[2] the victim testified that the defendant had abused him; Drs. Heise and DeMoss testified regarding their physical findings after examining the victim, which were indicative of abuse; and Dr. Heise testified that the victim identified the

---

[2] The defendant did not object to this hearsay testimony at trial, nor does he now challenge the admissibility of the statement on appeal. As such, we find that he has waived the issue for consideration. See State v. Smith, 24 S.W.3d 274 (Tenn. 2000).

defendant as his abuser. Accordingly, we find that the evidence was more than sufficient to support the defendant's conviction for rape of a child. Thus, the defendant's sufficiency challenge lacks merit.

## **<u>Conclusion</u>**

Based on the analysis above, we find that none of the defendant's allegations merit relief. Accordingly, the judgment of the trial court is AFFIRMED.

 

 

 

 

_____

JERRY L. SMITH, JUDGE