IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
March 28, 2006 Session

## SHAWN HUMPHREY, ET AL. v. TOMKATS, INC., ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 02C3161     Marietta Shipley, Circuit Judge**

**No. M2005-00867-COA-R3-CV - Filed on August 8, 2006**

On this appeal, the Appellant, TomKats, Inc., challenges the propriety of the trial court's awarding Appellee, Shawn Humphrey, judgment for breach of an oral agreement to pay commissions due for sales of sponsorships for an event called Dancin' in the District during the year 1999, failure to pay commissions due on sponsorship and vendor booth revenues pursuant to a written agreement for same event in the year 2000, the subsequent breach of that agreement for the years 2001 and 2002 and dismissal of Appellant's counterclaim for breach of a non-compete agreement and breach of fiduciary responsibilities. Humphrey challenges trial court's findings with regard to the amount of damages for commissions awarded for 1999 and the failure to award prejudgment interest on the judgment for breach of contract. We affirm, as modified.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court**
**Affirmed, as Modified**

DONALD P. HARRIS, SR. J., delivered the opinion of the court, in which ALAN E. HIGHERS and DAVID R. FARMER, JJ, joined.

Kenneth A. Weber, Nashville, Tennessee, for Appellant, TomKats, Inc.

Gerald E. Martin, Douglas S. Johnston, Jr., for Appellee, Shawn Humphrey.

**OPINION**

### I. FACTUAL BACKGROUND

The Plaintiff, Shawn Humphrey (Humphrey), is the owner of a company called Redstone Management that is in the business of selling sponsorships for entertainment events. The Defendant, TomKats, Inc. (TomKats), is a corporation owned by Tom Morales and his wife, Kathie Morales. Its core business is catering movie sets. It also owns Loveless Café in Pegram, Tennessee, and Sapphire Restaurant in Franklin, Tennessee. In 1991, Tom Morales' brother-in-law, Michael Moore, retired from the United States Air Force and it was decided to start a special events division within TomKats under Moore's leadership. This division catered such events as the Sara Lee Golf Classic

and the Saturn Homecoming. Later within this division, TomKats created and produced an event in Nashville, Tennessee, known as Dancin' in the District.

TomKats started its business by catering for Starwood, an outdoor entertainment venue located in Nashville, Tennessee. Humphrey worked for TomKats on a part-time basis for several years at that site. In early 1993, Humphrey was hired by TomKats to assist with the special events division. That employment soon became part-time and continued as such until 1998. During this period, TomKats started Dancin' in the District and employed Humphrey to set up the event stage and perform other tasks necessary for the production of that event. In 1998, Humphrey again became a full-time employee of TomKats' within the special events division.

Prior to the 1999 season of Dancin' in the District, Morales called a meeting of all the people who worked in the special events division. He informed them that the sale of sponsorships for the event was far less than the costs of putting on the event and unless additional sponsors were obtained the event and the division would be discontinued with the concurrent loss of their jobs. Morales asked that all employees of the special events division assist in selling additional sponsorships. Humphrey testified that following the meeting he asked Michael Moore if he would be paid a commission for the sale of sponsorships and was told by Moore that TomKats would pay twenty percent of any sponsorships he obtained. Morales denied offering to pay the special events employees a commission for sponsorships sold. Moore did not testify at trial.

According to Humphrey, as a result of the assurances he would receive a commission, he sold sponsorships that brought $48,400 in revenue to TomKats. At the same time, he performed his regular full-time duties setting up and producing the event.

Because TomKats' special events division was losing money, Tom Morales decided after the 1999 season of Dancin' in the District that the event should be sold and TomKats should focus on its catering business. He offered to sell the event to Michael Moore. Moore at first indicated he would be interested if Humphrey would be his partner in the acquisition but then found other business pursuits. Morales offered to sell the event to Humphrey.

While considering purchase of the event, Humphrey contacted several Nashville area businesses to determine whether he could develop enough sponsors for the event to make it profitable. One of the businesses he contacted was Cricket Communications (Cricket), a cellular telephone service provider owned by Chase Telecommunications, Inc. After some discussions, Cricket agreed in principle to being a title sponsor for the event and to paying $100,000.00 per year for a three year period.

When Humphrey had not made an offer to purchase Dancin' in the District by the end of January 2000, he and Morales began discussing an arrangement where Humphrey would terminate his employment with TomKats and become the exclusive agent for sponsorship sales for Dancin' in the District and other events produced by TomKats. After some negotiations, on March 2, 2000, Humphrey entered a "Business Agreement" (Business Agreement) with TomKats providing that

Humphrey, as an independent contractor, be the exclusive agent for the selling of sponsorships and vendor booth sales for Dancin' in the District and other TomKats produced events. This agreement was for a term of three years and provided Humphrey be compensated on a strictly commission basis.

Pursuant to the Business Agreement, Humphrey began to obtain written contracts from various businesses agreeing to sponsor Dancin' in the District. One of those contracts was with Cricket who agreed to become a title sponsor for Dancin' in the District for the years 2000, 2001 and 2003 for the payment of $100,000.00 per year for each of those three years. Other sponsorship contracts were signed that the trial court found brought in sponsorship revenues to TomKats totaling $188,550.00 and vendor booth sales of $10,282.00 in the year 2000. Humphrey was only paid commissions totalling $32,162.32.

Following the 2000 Dancin' in the District season, TomKats decided to sell the event. In a letter to Humphrey dated November 17, 2000, Tom Morales stated, "our 'Business Agreement' has to be terminated with regard to 'Dancin' in the District'." Morales also informed Humphrey that TomKats had decided to sell the event to new owners identified as Dancin' in the District LLC and, essentially[1], that the buyer would have the exclusive authority to negotiate all sponsorship agreements for the event.

By agreement dated November 21, 2000, TomKats sold Dancin' in the District to Dancin' in the District Partners for the sum of $200,000.00, with TomKats reserving a twenty percent interest in the event. The agreement provided that Dancin' in the District could purchase the reserved interest for an additional $100,000.00. The Purchase Agreement specifically provided that TomKats would assign to the buyer "all Seller's rights in its Title Sponsorship Agreement with Cricket." The agreement further provided that "Buyer shall have no liability or responsibility for any debt or other obligation incurred by Seller relative to Dancin' prior to the date of execution of this Agreement . . ."

Cricket remained a title sponsor of Dancin' in the District for the 2001 season and paid to the new owners the agreed upon $100,000.00. For the 2002 season, Cricket exercised its option to withdraw from sponsorship of the event by paying the sum of $15,000.00. Humphrey was not paid anything for his loss of commission for those years.

During his initial discussions with Cricket, there were conversations about Cricket also sponsoring events on six college campuses in Tennessee. Because of the costs of sponsoring these events, Cricket decided to see if it could persuade Nokia to participate in assuming responsibility for a portion of the costs. Cricket sold telephones manufactured by Nokia to its customers and it was common for Nokia to participate with companies that sold their equipment in promotional activities.

---

[1] The letter stated the purchase agreement contained a provision that Shawn Humphrey could negotiate and sell sponsorships to Nokia, Mello Yellow, Crystal Springs Water and John Casablanca's Talent Agency up until December 31, 2000, for which he would be paid a ten percent commission.

In late March 2000, Humphrey met with Barbara Armour, a representative of Nokia, to discuss his ideas for the Cricket college tour. Later in the year 2000, Ms. Armour attended one of the Dancin' in the District performances and thought the idea of producing similar events in other parts of the country was attractive. Tom Morales was at one of the meetings where the Cricket college tour was discussed. After this meeting, Morales met privately with Ms. Armour and reported that she was interested in putting together a forty-two event national concert tour. TomKats made a proposal for producing such a tour using an air dome owned by First Company Management Group. Neither the Tennessee college campus tour nor the forty-two event national concert tour were agreed upon.

Following the termination of the Business Agreement in November 2000, Humphrey was contacted by Ryan Partnership (Ryan), an advertising and marketing agency located in Texas who represented Nokia. Ryan sought information concerning the production of a seven event college tour in western and mid-western states to be called the Ride The Light tour. After Humphrey supplied the information, Ryan retained him to actually produce the events in late February or early March 2001. For his participation, Humphrey's company, Redstone Management, received $420,986 to produce the Ride The Light Tour and realized a profit of $119,030.00.

Humphrey brought suit for the sponsorship commissions he claims he was promised for the 1999 Dancin' in the District season, the commissions provided for in the Business Agreement for sponsorship and vendor booth sales he made in the 2000 season and for the commissions he claimed he earned for the Cricket sponsorship payments made for the 2001 and 2002 years. TomKats filed a counterclaim alleging Humphrey violated his non-compete agreement, misused confidential information and violated its fiduciary responsibilities owed TomKats by agreeing to produce Nokia's Ride The Light tour. The case was tried without a jury January 24-27, 2005. The trial court found there was an oral agreement to pay Humphrey a commission for sponsorships sold by him during the 1999 Dancin' in the District season and awarded him a ten percent commission or $4,840.00 for the $48,400.00 in sponsorships he sold and were paid to TomKats. Humphrey was also awarded $15,638.36 for commissions for sponsorship and vendor booth sales for the 2000 season that were earned but not paid by TomKats together with pre-judgment interest at the rate of ten percent per annum in the amount of $6,255.34, for a total of $21,893.70. The trial court held Humphrey was entitled to $28,750.00 without prejudgment interest for the payments made by Cricket for the 2001 and 2002 seasons under both of Humphrey's claims for breach of contract or unjust enrichment. Finally, the trial court denied TomKats' counterclaim for Humphrey's alleged violation of the non-compete agreement or breach of fiduciary responsibilities. Both parties have appealed.

## II. ISSUES RAISED ON APPEAL

On this appeal, TomKats argues that the trial court erred by (1) entering a judgment in favor of Humphrey on his breach of oral contract claim for commissions for sponsorships he sold in 1999; (2) entering judgment in favor of Humphrey for $21,893 for commissions earned on sponsorship and vendor booth sales in 2000; (3) entering judgment in favor of Humphrey for breach of contract and unjust enrichment claim for commission on revenue generated from the Cricket sponsorship contract in years subsequent to 2000; and (4) entering judgment in favor of Humphrey on TomKats'

-4-

counterclaim. Humphrey argues on this appeal that the trial court erred by not awarding prejudgment interest on $28,750 awarded for breach of contract or unjust enrichment on revenue generated by the Cricket sponsorship contract for the years 2001 and 2002 and by limiting the award for sponsorships sold by Humphrey in 1999 to ten percent.

## III. ANALYSIS

### A. Standard of Review

The standard of review on appeal is well-settled. We review the trial court's factual findings de novo, with a presumption of the correctness, unless the evidence preponderates otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). "Because the trial judge is in a better position to weigh and evaluate the credibility of the witnesses who testify orally, we give great weight to the trial judge's findings on issues involving credibility of witnesses." *Randolph v. Randolph*, 937 S.W.2d 815, 819 (Tenn. 1996) (citing, *Gillock v. Board of Professional Responsibility*, 656 S.W.2d 365, 367 (Tenn. 1983). There is no presumption of correctness that attaches to the trial court's conclusions of law. *Southern Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

The issues raised on this appeal involve interpretation of written agreements. The interpretation of a contract is a question of law. *Guiliano v. CLEO, Inc.*, 995 S.W.2d 88, 95 (Tenn. 1999) . Therefore, the trial court's interpretation of a contractual document is not entitled to a presumption of correctness on appeal. *Id* .; *Angus v. Western Heritage Ins. Co.*, 48 S.W.3d 728, 730 (Tenn. Ct. App. 2000) . This court must review the documents ourselves and make our own determination regarding their meaning and legal import. *Hillsboro Plaza Enters. v. Moon*, 860 S.W.2d 45, 47 (Tenn. Ct. App. 1993) . It is well-settled that the intent of the contracting parties at the time of executing the agreement should govern. *Planters Gin Co. v. Fed. Compress & Warehouse Co., Inc.*, 78 S.W.3d 885, 890 (Tenn. 2002). The court's role in resolving disputes regarding the interpretation of a contract is to ascertain the intention of the parties based upon the usual, natural, and ordinary meaning of the language used. *Guiliano*, 995 S.W.2d at 95; *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975) .

Where the language of the contract is clear and unambiguous, its literal meaning controls the outcome of contract disputes. Where a contractual provision is ambiguous, that is, susceptible to more than one reasonable interpretation, and the parties' intent cannot be determined by a literal interpretation of the language or pertinent rules of construction, the legal meaning of the contract becomes a question of fact. *Planters Gin Co.*, 78 S.W.3d at 890.

### B. Commissions on sales of sponsorships in 1999.

Humphrey claimed he was promised by Michael Moore, Director of Operations for the Special Events Division of Tomcats, a commission of twenty percent for Dancin' in the District sponsorships he sold for the 1999 season. An oral agreement is enforceable, but the party seeking

to enforce it must prove (1) mutual assent to the contract's terms and (2) that the terms are sufficiently definite to be enforceable. *Davidson v. Holtzman*, 47 S.W.3d 445, 453 (Tenn. Ct. App. 2000); Castelli v. Lien, 910 S.W.2d 420, 426-27 (Tenn. Ct. App. 1995). As the court stated in *Jamestowne on Signal, Inc. v. First Federal Savings & Loan Association*, 807 S.W.2d 559, 564 (Tenn. Ct. App. 1990):

> [A] manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.
>
> The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.
>
> The fact that one or more terms of a proposed bargain are left open or uncertain may show that a manifestation of intention is not intended to be understood as an offer or as an acceptance.
>
> *Id.* (citing Restatement, Contracts 2d § 33).

The trial court in the case before us found the existence of an oral contract. The proof with regard to this issue came from Shawn Humphrey and Tom Morales. Humphrey testified that Michael Moore, the Director of Operations for the TomKats Special Events Division, promised him a twenty percent commission for sponsorships sold. Tom Morales testified Humphrey was not offered a commission for sponsorships sold in 1999. Michael Moore did not testify. By ruling in favor of Humphrey, the trial court must have accepted Humphrey's version of the facts. Since the existence of the 1999 oral contract came down to a question of credibility, great deference must be given the findings of the trial judge who personally observed the witnesses and their demeanor and is a better position than a reviewing court to make that determination. The evidence does not preponderate against the findings of the trial court that an oral contract existed.

In order for there to have been an enforceable oral contract the court must have found the parties agreed upon a rate of commission. The only evidence as to the rate of commission was the testimony of Shawn Humphrey that he was to receive twenty percent of the sponsorships sold. The trial court nonetheless awarded damages of ten percent based upon the court's interpretation of the evidence that another employee of TomKats was paid a ten percent commission for the sale of sponsorships. We are of the opinion the trial court erred by not awarding damages in accordance with the only evidence as to the agreed upon commission rate.

Moreover, the trial court's interpretation of the evidence that another employee who sold sponsorships during the year 1999 was compensated at a ten percent rate of commission was erroneous. According to the testimony of Tom Morales, in 1999, TomKats used Karma, a company owned by Kathy Armistead for sponsorship sales. Karma was paid a total commission of twenty percent, fifteen percent plus five percent for proof of performance. TomKats also had an in-house person, Patty Bullington, who sold sponsorships to Dancin' in the District. She was paid a

commission of twenty percent until she had earned $40,000.00 in commissions in any given year at which point her commission rate would be reduced to ten percent. The fact that other employees and independent contractors were paid a twenty percent commission for revenues produced from sponsorship sales further corroborates the testimony of Humphrey that TomKats also agreed to pay him a twenty percent commission. We are therefore of the opinion the judgment of the trial court awarded for the 1999 sponsorship sales should be increased to $9,680.00 or twenty percent of the revenues the trial court found were produced.

> *C. The year 2000 sponsorship and vendor booth sales.*

The Appellant, TomKats, next challenges the trial court's awarding Humphrey a judgment for $21,893.70 for his breach of contract claim related to the year 2000 sponsorship and vendor booth sales. The Appellant argues that the trial court erred in its interpretation of the phrase "proof of performance" contained in the Business Agreement between the parties and further erred by allowing Humphrey to present post-trial evidence with regard to his claim for vendor booth sales.

The Business Agreement executed by the parties contains the following provision:

"C. Compensation

• Shawn Humphrey will receive a 25% commission (consisting of 20% sales commission and 5% proof-of-performance commission) on <u>any and all</u> gross sponsorship sales and gross vendor booth sales secured for any of the 2000, 2001, or 2002 Dancin' in the District© seasons." (emphasis added)

At trial, Humphrey took the position that proof of performance referred to presenting the sponsor with documentation that it had received what it contracted for in the sponsorship agreement such that the sponsor would be satisfied final payment should be made. Tom Morales took the position "proof of performance' is a term of art applying only to sponsors who are promised media coverage as part of their sponsorship agreement and consists of documenting that the sponsor's advertisements were aired or published in accordance with their sponsorship agreements. TomKats accordingly took the position Humphrey would not be entitled to the 5% proof of performance commission for sponsors not paying for media coverage.

"The purpose of interpreting a written contract is to ascertain and to give effect to the contracting parties' intentions. In the case of written contracts, these intentions are reflected in the contract itself. Thus, the search for the contracting parties' intent should focus on (1) the four corners of the contract, (2) the circumstances in which the contract was made, and (3) the parties' actions in carrying out the contract." *Marshall v. Jackson & Jones Oils, Inc.*, 20 S.W.3d 678, 681 (Tenn. Ct. App. 1999) (citations omitted). In the absence of fraud or mistake, courts should construe contracts as written and accord contractual terms their natural and ordinary meaning. *Id.*

While we agree the phrase "proof of performance" may have different interpretations, the natural and ordinary meaning of the language of the contract clearly indicates it should be interpreted in such a way that it applies to "any and all" sponsorship sales. Since the interpretation of Humphrey satisfied that requirement and the interpretation of Tom Morales did not, the trial court did not err in accepting Humphrey's understanding of the phrase as representing the intention of the parties at the time the contract was made.

The Appellant next argues that it was error for the trial court to allow Humphrey to present post-trial evidence on his claim for vendor booth sales. During the trial of the case, in order to prove the vendor booth sales on which he was entitled to a commission, Humphrey introduced into evidence a Statement of Operation prepared by TomKats which reflected 2000 revenue of $10,282.00 in "Vendor Site Commissions" for Dancin' in the District. Because Tom Morales testified that the figures contained in the Statement of Operations did not necessarily prove the monies had, in fact, been received by TomKats, the court gave the parties the opportunity to file affidavits with regard to this issue. Humphrey filed an affidavit indicating he had collected $11,136.00 in vendor booth revenues. The trial court awarded commissions, however, on $10,282.00, the amount that was proven at trial. Since the trial court did not alter its judgment based upon the post-trial affidavits, this issue is without merit.

### D.  Revenue generated from the Cricket contract in years subsequent to 2000.

Appellant alleges the trial court erred in awarding Humphrey $28,750.00 for commissions he would have earned on the Cricket sponsorship contract for the years subsequent to 2000. The trial court awarded Humphrey this amount on both a theory of breach of contract and unjust enrichment. In our view, Humphrey was entitled to the amount awarded by the trial court for breach of contract.

According to the Business Agreement between TomKats and Humphrey, Humphrey had a three year exclusive sponsorship sales agreement for Dancin' in the District. Pursuant to this agreement, Humphrey was to receive twenty-five percent of all sponsorship revenues received by TomKats during this period. Humphrey procured a three year title sponsorship agreement with Cricket for $100,000.00 per year. On November 21, 2000, TomKats sold the event to a new entity, received $200,000.00 in cash and retained an interest in the event. The Cricket contract was, as part of the purchase agreement, assigned to the new entity. The agreement further provided that the new owner would have no liability or responsibility for any debt or other obligation incurred by TomKats prior to the date of execution of the purchase agreement.

By letter dated November 17, 2000, TomKats advised Humphrey the Business Agreement with regard to Dancin' in the District was being terminated and the event was being sold. We view that letter as a repudiation of the contract between TomKats and Humphrey. In order to serve as an anticipatory breach of contract or repudiation, the words and conduct of the contracting party must amount to an unqualified refusal to perform the contract. *Wright v. Wright*, 832 S.W.2d 542, 545(Tenn. Ct. App. 1991). In the alternative, a party may breach a contract by committing a

voluntary act which renders the party unable or apparently unable to perform the contract. *Id..*; 545; Restatement of Contracts 2d, § 250 , p. 272. Thus, where a party disables itself from performing a contract, the other party may treat the contract as broken and sue for breach without waiting for the time fixed for performance. *Church Of Christ Home For Aged, Inc., et al. v. Nashville Trust Co.,* 184 Tenn. 629, 642; 202 S.W.2d 178, 183(Tenn. 1947); *Brady v. Oliver*, 125 Tenn. 595, 611-612, 147 S.W. 1135, 1138-1139 (Tenn. 1911); *Jamison v. Jamison Pest Control*, 852 S.W.2d 884 (Tenn. App. 1992).

While TomKats' sponsorship agreement with Cricket provided for the payment of $100,000.00 per year for a period of three years, it also contained a provision allowing Cricket to withdraw from the agreement if it notified TomKats on or before October 1 of the preceding year and pay a $15,000.00 penalty. At the time TomKats sold Dancin' in the District to the new owners, Cricket had not notified TomKats they would withdraw their sponsorship for the 2001 season so that the new owners were assured of receiving a minimum of $115,000.00 from the Cricket sponsorship, $100,000 for 2001 and, even if Cricket withdrew its sponsorship for the year 2002, a $15,000.00 penalty. In accordance with the Business Agreement, Humphrey would have been entitled to a twenty-five percent commission on that amount. The trial court correctly awarded Humphrey damages for the loss of the least amount in commissions that Humphrey would have received as of the date TomKats breached the Business Agreement.

### E. Dismissal of TomKats' countercomplaint.

TomKats further alleges the trial court erred by dismissing its counterclaim against Humphrey. TomKats alleged Humphrey misused confidential information concerning proposals made by TomKats to produce a 42 event concert tour for Nokia. TomKats further alleged that when Humphrey undertook to produce the Ride The Light seven event tour, it misappropriated a business opportunity of TomKats. These claims were based upon Humphrey's alleged violation of a fiduciary duty owed Tomkats and a violation of the Business Agreement which contained the following provision:

> G. Non-Compete Clause
> For consideration and inducement to enter into this agreement, Shawn Humphrey agrees not to compete with TomKats by creating new events with out (sic) first giving TomKats the option to participate as a "food and beverage concessionaire". Shawn Humphrey acknowledges that TomKats, in reliance of this agreement, is providing Shawn Humphrey access to trade secrets, customers, and other confidential data and Shawn Humphrey agrees to keep such information confidential.

The trial court found this paragraph of the agreement to be so uncertain as to be largely unenforceable. Moreover, because non-compete clause had no time and space limitations, whatever protections it afforded were effectively limited to the life of the contract. The court appears to have concluded that once Humphrey was "fired" in November 2000, this contract provision became a nullity and unenforceable.

A breach of contract by non-performance or by repudiation of a contract gives rise to a claim for total breach if it so substantially impairs the value of the contract to the injured party at the time of the breach that it is just under the circumstances to allow the injured party to recover damages based on all of the injured party's remaining rights to performance. *Church Of Christ Home For Aged, Inc., et al. v. Nashville Trust Co.,* 184 Tenn. 629, 642; 202 S.W.2d 178, 183 (Tenn. 1947); *Freytag vs. S. S. Crass, Jr.*, 913 SW2d 171, 174 (Tenn. Ct. App. 1995); Restatement of Contracts 2d, §243, §250. Additionally, in this situation, the injured party is relieved from further performance under the contract. See *Worsham vs. Action Realtors, Inc.*, 1995 Tenn App LEXIS 251, C.A. NO. 03A01-9412-CV-00428, 1995 WL 238398 at *4 (Tenn. Ct. App. April 21, 1995); Restatement of Contracts 2d, §253. In our view, after the November 17, 2000, letter from TomKats, Humphrey was relieved from further performance under the Business Agreement. Certainly, the exclusive right to sell Dancin' in the District sponsorships for a three year period was central to the Business Agreement between the parties and terminating that right substantially impaired the value of the contract to Humphrey. While TomKats contended the remainder of the Business Agreement relative to the sale of sponsorships for other TomKats events remained in force, the record reflects the only event for which Humphrey sold sponsorships or vendor booth rentals was Dancin' in the District. We agree with the determination of the trial court that after November 17, 2000, the non-compete provision in the Business Agreement was unenforceable. Since Humphrey only became involved in the Ride The Light tour after that date, there was no violation of this agreement.

The trial court also found that TomKats failed to prove Humphrey misused confidential information. This court has held that the following types of information are not confidential absent evidence to the contrary:

(1) Remembered information as to a business's prices;

(2) The specific needs and business habits of certain customers; and

(3) An employee's personality and the relationships which he has established with certain customers. *Venture Express v. Zilly,* 973 S.W.2d 602, 606 (Tenn. Ct. App. 1998)(citations omitted). Since the Business Agreement did not define the types or categories of information that was to be considered confidential information, we have used this holding to determine the types of information that should not be considered confidential as that term was used in the Business Agreement. Because any information that may have been used by Humphrey falls within the foregoing categories, we concur with the trial court's determination.

Appellant finally takes the position that Humphrey was an agent for TomKats and, as such, owed TomKats a fiduciary duty not to usurp or divert any corporate opportunities TomKats might have with Nokia. The trial court found that Humphrey was an independent contractor and owed TomKats no fiduciary duty relying on *Pinehurst, Ltd. v. Jarratt,* 1991 LEXIS 906, 1991 WL 241184 (Tenn. Ct. App. 1991).

We agree with the Appellant that an agent is a fiduciary with respect to matters within the scope of the agency. *Roberts v. Iddins,* 797 S.W.2d 615, 617 (Tenn. Ct. App. 1990). Whether an agency relationship exists at all must be determined by the facts and circumstances of the case. The intentions of the parties are not controlling. *Rich Printing Company v. McKellar's Estate*, 46 Tenn. App. 444, 330 S.W.2d 361, 376 (1959). Thus, the fact that the Business Agreement refers to Humphrey as an independent contractor in the parties' franchise agreement is of no significance. *Franklin Distributing Co., Inc. v. Crush Int'l, Inc.*, 726 S.W.2d 926, 930 (Tenn. Ct. App. 1986). What is significant is whether the "principal authorizes the agent to act for the principal's benefit [and] at the same time retains the right to control the agent's conduct." *Hussmann Refrigeration, Inc. v. South Pittsburg Associates*, 697 S.W.2d 588, 592 (Tenn.App.1985).

While the trial court did not specifically address the issue of whether Humphrey was an agent for TomKats, we need not make that determination. If Humphrey was an agent for TomKats, the scope of the agency was limited to selling sponsorships and vendor booths for Dancin' in the District and, perhaps, other events produced by TomKats. The Business Agreement reflects the parties understood that Humphrey could become involved in the creation and production of other events in competition with TomKats. Humphrey's only obligation with respect to involving himself in such events during the life of the Business Agreement was to offer TomKats the right to serve as concessionaire. We agree with the trial judge that with regard to the production of events other than those produced by TomKats, Humphrey was an independent contractor and had no fiduciary responsibilities. We therefore affirm the trial court's dismissal of Appellant's counterclaim.

*E. The failure of the trial court to award Plaintiff pre-judgment interest.*

Finally, the plaintiff argues that the trial court erred in refusing to award prejudgment interest for the breach of contract found as part of the damages in this case. The defendants argue that the trial court properly found that prejudgment interest was not appropriate because the existence of the obligation was disputed and contested.

Tennessee Code Annotated section 47-14-123 provides, in pertinent part:

Prejudgment interest, i.e., interest as an element of, or in the nature of, damages, as permitted by the statutory and common laws of the state as of April 1, 1979, may be awarded by courts or juries in accordance with the principles of equity at any rate not in excess of a maximum effective rate of ten percent (10%) per annum . . .

A trial court has the discretion to award prejudgment interest. *Hunter v. Ura,* 163 S.W.3d 686, 706 (Tenn. 2005); *Myint v. Allstate Ins. Co.*, 970 S.W.2d 920, 927 (Tenn. 1998) . The purpose of prejudgment interest "is to fully compensate a plaintiff for the loss of the use of funds to which he or she was legally entitled, not to penalize a defendant for wrongdoing." *Myint,* 970 S.W.2d at 927. The trial court must consider whether the amount of the obligation was certain or ascertainable and whether the existence of the obligation was disputed on reasonable grounds. *Id.*

-11-

The uncertainty of the existence or amount of an obligation does not mandate a denial of prejudgment interest. A trial court's grant of such interest is not automatically an abuse of discretion even though there is an element of uncertainty as to the existence or amount of a claim. These are simply factors to consider along with the other circumstance of the case in determining whether the awarding of prejudgment interest is equitable. *Id.* at 928 .

The record in the case before us reveals that the trial court gave consideration to this issue and the circumstances of the case. The trial court expressed concern about the time that had elapsed prior to trial, as well as the uncertainty as to the existence of TomKats's obligation for breach of contract. There is no indication that the trial court failed to consider the relevant factors. After reviewing the record, we cannot conclude that the trial court abused its discretion by denying prejudgment interest for the breach of contract award.

## IV. CONCLUSION

The judgment of the trial court is affirmed, as modified, and this matter is remanded with costs of appeal assessed against TomKats, Inc.

_____
DONALD P. HARRIS, SENIOR JUDGE